UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

LEE WOODS,

                  Plaintiff,

      vs.

ANTHONY J. ANNUCCI, Acting
Commissioner, Department of Corrections
and Community Supervision; JAMES
O'GORMAN, Deputy Commissioner for
Correctional Facilities; JOSEPH BELLNIER,
former DOCCS Deputy Commissioner for
Correctional Facilities; CHRISTOPHER
MILLER, Superintendent of Great Meadow;
DAVID ROCK, former Superintendent of
Great Meadow; DALE ARTUS,
Superintendent of Attica; JOSEPH NOETH,
former Acting Superintendent of Attica; and
RAYMOND COVENY, Superintendent of
Elmira; DONALD VENETTOZZI, Director
of DOCCS Special Housing and Inmate
Disciplinary Program; and ALBERT
PRACK, former Director of DOCCS Special
Housing and Inmate Disciplinary Program;
JOHN or JANE DOES 1–5, members of the
DOCCS SHMC at Great Meadow; JOHN or
JANE DOES 6–10, members of the DOCCS
SHMC at Attica; JOHN or JANE DOES 11–
15, members of the DOCCS SHMC at
Elmira.

                  Defendants.

**FIRST AMENDED COMPLAINT**

**JURY TRIAL REQUESTED**

No. 9:20-cv-570 (BKS/CFH)

---

       Plaintiff Lee Woods ("Plaintiff" or "Mr. Woods"), by his counsel Sidley Austin LLP, as

and for this Complaint, alleges the following:

## INTRODUCTION

       1.     This is a civil rights action for injunctive and declaratory relief, as well as

compensatory and punitive damages, under 42 U.S.C. § 1983 ("Section 1983") for violations of

Mr. Woods's rights to due process under the Fourteenth Amendment of the Constitution of the United States and to be free from cruel and unusual punishment under the Eighth Amendment of the Constitution of the United States.

2.      For over ten consecutive years, Mr. Woods has been subjected to long-term, cumulative, and continuous punishment by being placed in solitary confinement[1] while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") and while also a patient of the New York State Office of Mental Health ("OMH").  Mr. Woods is presently confined alone in a 7-foot by 9-foot concrete cell—less than one-half the size of a parking space—for at least 23 hours a day.  He is denied meaningful human contact for extended periods of time.  Although he has not acted in any way while incarcerated to warrant such extreme treatment, Mr. Woods has fewer rights and privileges than do prisoners in the general population.  He eats alone off a tray provided to him through a slot in his door and is denied access to therapeutic or mental health groups and programs.  He is effectively denied regular access to outdoor activity, as well as access to religious, vocational, recreational, and educational programs.  The scant outdoor time he is afforded takes place in a small fenced enclosure with no equipment provided.  Even this limited recreation is often inaccessible to Mr. Woods because he is denied access to appropriate clothing for the cold temperatures of northern New York.

---

[1] Mr. Woods uses the term "solitary confinement" to refer to his confinement in the Special Housing Unit ("SHU") under both administrative segregation ("Ad Seg") status and disciplinary sanctions ("Disciplinary Seg").  The National Commission on Correctional Health Care ("NCCHC") similarly defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."  National Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation) (2019), available at http://www.ncchc.org/solitary-confinement.  This confinement has other names, including isolated confinement, extreme isolation, segregation, room restriction, and SHU, but, in all cases, the prisoner experiences the same harmful isolation and other deprivations.

3.     It is well established that prolonged solitary confinement causes severe harm and has compounding negative effects, especially on the young, disabled, and mentally ill. Nevertheless, DOCCS subjects numerous New York State prisoners to prolonged solitary confinement, including Mr. Woods.

4.     The Defendants are aware of this practice and of its harmful results.  Yet, the Defendants have consistently failed to intervene on behalf of Mr. Woods to prevent his continued, long-term punishment of solitary confinement.  The Defendants have failed to act, despite their knowledge that DOCCS's placement of Mr. Woods in solitary confinement caused his mental health to deteriorate to the point that he attempted suicide.

5.     Through their policies and practices, as well as other acts and/or omissions, Defendants have subjected Mr. Woods to solitary confinement for an unreasonable and unconstitutional length of time.  Defendants have failed to provide Mr. Woods with adequate due process regarding the review of his administrative and/or disciplinary punishments, instead effectively rubber-stamping such reviews for over ten years.

6.     Mr. Woods's years of solitary confinement have caused him and continue to cause him to suffer enduring physical and emotional trauma.  He has experienced digestive problems, appetite loss, persistent pain, aggravation of a previously injured knee, hemorrhoids, polyps, hair loss, deterioration of hearing and sight, skin growths, and an injured foot and shoulder.  Mr. Woods's already tenuous mental health has continued to deteriorate in the past decade due to his solitary confinement, progressing from an OMH Mental Health Level 6 designation (someone who needs the least amount of services) to a Level 1 designation (someone in need of the most help).  Mr. Woods has a history of suicidal ideation, and gestures, and he suffers from paranoia, anxiety, depression, and hallucinations.  He attempted suicide in 2016,

and has engaged in other instances of self-harm.  Yet, Defendants have refused, and continue to

refuse, to take corrective action by placing Mr. Woods in a less restrictive environment, and by

providing him with appropriate mental health treatment.

**JURISDICTION AND VENUE**

7.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1343, by virtue of claims under 42 U.S.C. §§ 1983 and 1988, as well as the Eighth

and Fourteenth Amendments of the Constitution of the United States.  Moreover, the Court can

order declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  Rule 65 of the Federal Rules of

Civil Procedure authorizes injunctive relief.  This Court has the authority to award costs and

attorneys' fees under 42 U.S.C. § 1988.

8.    Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2) because

a substantial portion of the events constituting Mr. Woods's claims have taken place within this

district while he was imprisoned at Great Meadow Correctional Facility.

**PARTIES**

9.    Plaintiff LEE WOODS is a 42-year-old Rastafarian man, who suffers from mental

illness and a variety of physical ailments, presently held in the custody of DOCCS at Elmira

Correctional Facility ("Elmira") in Elmira, New York.  Mr. Woods was, on the dates and times

hereinafter mentioned, also confined in SHU and/or Ad Seg at Downstate Correctional Facility

("Downstate"), Clinton Correctional Facility ("Clinton"), Auburn Correctional Facility

("Auburn"), Upstate Correctional Facility ("Upstate"), Attica Correctional Facility ("Attica"),

Central New York Psychiatric Center ("CNYPC"), and Great Meadow Correctional Facility

("Great Meadow").  The allegations in this Amended Complaint are based upon Mr. Woods's

personal knowledge, as well as upon information and belief.

**DOCCS DEFENDANTS**

10.     At all times relevant to Mr. Woods's causes of action, each Defendant named

herein was employed by, and acted under color of law of, the State of New York.

11.     Plaintiff asserts each and every allegation relating to "Defendants" individually as

to each such Defendant included in such definition, and such pleading referring to such defined

Defendants is solely due to convenience, economy, and the avoidance of repetition.

<u>DOCCS Commissioner</u>

12.     The DOCCS Commissioner is responsible for the care, custody, and control of all

prisoners housed in DOCCS facilities.  The DOCCS Commissioner has final policy-making and

supervisory authority within DOCCS and is personally involved in authorizing and maintaining

the unconstitutional policies and customs challenged by Mr. Woods.  Defendant ANTHONY

ANNUCCI ("Annucci") has served as Acting Commissioner of DOCCS since approximately

April 2013.  Annucci is responsible for the overall management and operation of DOCCS, which

includes oversight of correctional institutions and assuring compliance with state and federal

law.  His responsibilities include review and approval of the transfer of prisoners to SHU,

including Ad Seg and Disciplinary Seg, through Central Office review.  Upon information and

belief, Annucci approved Mr. Woods's continued solitary confinement for a period of time

relevant to this action.  He is being sued in his individual and official capacities.

13.     Annucci is aware of the unconstitutional policies and practices used by DOCCS to

keep inmates in solitary confinement for lengthy periods of time.  As a defendant in *Peoples, et

al. v. Annucci, et al.*, No. 11 Civ. 2694 (S.D.N.Y. April 18, 2011), Annucci is well aware of

claims filed by inmates subjected to lengthy periods of confinement in SHU and the resulting

unconstitutional risk of harm to inmates.  Despite his awareness of the unconstitutional risk of

harm to inmates, including Mr. Woods, Defendant Annucci has failed to remedy the unconstitutional policies and practices that have enabled the violations of Mr. Woods's rights.

14.    In addition to failing to correct unconstitutional policies and practices, Defendant Annucci has failed to enact policies and procedures to provide reasonable accommodation to inmates with disabilities who are confined to SHU.

DOCCS Deputy Commissioners

15.    The DOCCS Deputy Commissioners, as executive officers of DOCCS, have policy-making and supervisory authority within DOCCS and were, or are, personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Woods.

16.    The Deputy Commissioners are JAMES O'GORMAN ("O'Gorman"), Deputy Commissioner for Correctional Facilities; and JOSEPH BELLNIER ("Bellnier"), former DOCCS Deputy Commissioner for Correctional Facilities.

17.    O'Gorman as the Deputy Commissioner for Correctional Facilities is responsible for the overall management and operation of the correctional institutions within DOCCS, including Great Meadow, Attica, and Elmira.  His responsibilities include reviewing and approving the transfer and assignment of prisoners to SHU, including Ad Seg.  By law, O'Gorman is the final arbiter of Mr. Woods's continued placement in solitary confinement. *See* 7 N.Y.C.R.R. § 301.4(d)(3).  Upon information and belief, O'Gorman approved Mr. Woods's continued confinement in Disciplinary Seg and Ad Seg for a period of time relevant to this action.  This approval process included signing each review despite lacking any justification for continuing such detention, but nonetheless proceeding in knowing disregard of the facts. O'Gorman is being sued in his individual and official capacities.

18.    Bellnier was the Deputy Commissioner for Correctional Facilities from approximately 2011 until his retirement in or about September 2017.  He was responsible for the

overall management and operation of the correctional institutions within DOCCS, including Great Meadow, Attica, and Elmira.  His responsibilities included review and approval of the transfer and assignment of prisoners to SHU, including Ad Seg.  By law, Bellnier was the final arbiter of Mr. Woods's continued placement in solitary confinement.  *See* 7 N.Y.C.R.R. § 301.4(d)(3).  Upon information and belief, Bellnier approved Mr. Woods's continued confinement in Disciplinary Seg and Ad Seg for a period of time relevant to this action.  This approval process included signing each review despite lacking any justification for continuing such detention, but nonetheless proceeding in knowing disregard of the facts.  Bellnier is being sued in his individual capacity.

DOCCS Superintendents

19.    The DOCCS Superintendents are responsible for the care, custody, and safety of all prisoners under their immediate jurisdiction.  Each DOCCS Superintendent managed or manages a DOCCS facility where Mr. Woods was or is housed in SHU and had or has policy-making and supervisory authority with regard to all operations at their respective facilities.  Moreover, the DOCCS Superintendents are personally involved in the decision to confine inmates in Ad Seg and Disciplinary Seg, including at all relevant times in the unconstitutional confinement of Mr. Woods.  *See* 7 N.Y.C.R.R. § 300.2(a) (stating the Superintendent designates certain areas of the facility as Special Housing Units).  New York law requires the DOCCS Superintendents to review any report drafted by the administrative segregation review board and to make a determination whether to retain the inmate in solitary confinement or to release the inmate from administrative segregation.  *See* 7 N.Y.C.R.R. § 301.4(d)(2).  The DOCCS Superintendents also review disciplinary hearings that impose punishments to solitary confinement, and also decide whether to impose disciplinary segregation.  *See* 7 N.Y.C.R.R. §§ 254.9, 301.2(a).

20.     New York law therefore requires the personal involvement of each of the DOCCS Superintendent Defendants in Mr. Woods's continued solitary confinement:  CHRISTOPHER MILLER ("Miller"), Superintendent of Great Meadow; DAVID ROCK ("Rock"), former Superintendent of Great Meadow; DALE ARTUS ("Artus"), Superintendent of Attica; JOSEPH NOETH ("Noeth"), former Acting Superintendent of Attica; and RAYMOND COVENY ("Coveny"), Superintendent of Elmira.

21.     Miller is directly responsible for the treatment of Mr. Woods.  He decides the placement of inmates at Great Meadow and, in knowing disregard of their lack of justification, signed off on the perfunctory Ad Seg reviews described in detail below.  Miller is being sued in his individual and official capacities.

22.     Rock was directly responsible for the treatment of Mr. Woods.  He decided the placement of inmates at Great Meadow and, in knowing disregard of their lack of justification, signed off on the perfunctory Ad Seg reviews described in detail below.  Rock is being sued in his individual capacity.

23.     Artus is directly responsible for the treatment of Mr. Woods.  He decides the placement of inmates at Attica and, in knowing disregard of their justification, signed off on the summary Ad Seg reviews described in detail below.  Artus is being sued in his individual and official capacities.

24.     Noeth was directly responsible for the treatment of Mr. Woods.  He decided the placement of inmates at Attica and, in knowing disregard of their justification, signed off on the perfunctory Ad Seg reviews described in detail below.  Noeth is being sued in his individual capacity.

25.    Coveny is directly responsible for the treatment of Mr. Woods.  He decides the

placement of inmates at Elmira and signed off on the cursory Ad Seg reviews described in detail

below.  Coveny is sued in his individual and official capacity.

DOCCS SHU Directors

26.    The DOCCS Special Housing Unit Director has policy-making and supervisory

authority with regard to SHU and the DOCCS disciplinary process.  A DOCCS SHU Director's

authority includes reviewing, affirming, modifying, or reversing dispositions imposed at Tier III

Hearings.

27.    Hereinafter, the SHU Directors include: DONALD VENETTOZZI

("Venettozzi"), Director of DOCCS Special Housing and Inmate Disciplinary Program; and

ALBERT PRACK ("Prack"), former Director of DOCCS Special Housing and Inmate

Disciplinary Program.

28.    Both Venettozzi and Prack directly contributed to Mr. Woods's indefinite solitary

confinement, as each reviewed Mr. Woods's disciplinary appeals and made the final

determination as to his punishment.

29.    Vennettozi is being sued in his official and individual capacity; Prack is being

sued in his individual capacity only.

DOCCS Special Housing Management Committee

30.    DOCCS utilized a Discretionary Review Committee ("DRC") at each facility to

determine whether a SHU prisoner should be granted a time-cut to his SHU sentence under the

Superintendent's discretionary authority.  Upon information and belief, in April 2013, DOCCS

replaced the DRC with the Special Housing Management Committee ("SHMC") to be comprised

of a Deputy Superintendent (to serve as a chairperson, lend guidance, and counsel staff), a SHU

sergeant, a disciplinary lieutenant, and others designated by the Superintendent.  Upon

information and belief, while the SHMC is required by DOCCS directives to make "recommendations" to the Superintendent, in practice it regularly exercised *de facto* power over time-cuts because Superintendents regularly rubber-stamped the determination without engaging in any independent analysis.

31.     Hereinafter, the SHMC Defendants are: JOHN or JANE DOES 1–5, members of the DOCCS SHMC at Great Meadow Correctional Facility during Mr. Woods's confinement to SHU at that facility; JOHN or JANE DOES 6–10, members of the DOCCS SHMC at Attica during Mr. Woods's confinement to SHU at that facility; and JOHN or JANE DOES 11–15, members of the DOCCS SHMC at Elmira during Mr. Woods's confinement to SHU at that facility.

## STATEMENT OF FACTS

### Early Life

32.     Mr. Woods has been continuously held in solitary confinement by Defendants since 2009, when he was 30 years old.  He is currently 42 years old.

33.     Mr. Woods has a lifelong history of mental illness and disabling conditions.  He was raised "on and off" by his mother and other family members, and did not meet his biological father until Mr. Woods was incarcerated.  Throughout his childhood, Mr. Woods was the victim of physical and sexual abuse by various family members.  He was beaten by his stepfathers and uncles and, starting around the age of eight, was repeatedly molested by his ex-stepfather's wife. Around that time, he also began using substances such as marijuana and alcohol.

34.     Between the ages of 9 and 11, Mr. Woods was sent to Schneider Children's Hospital at Long Island Jewish Medical Center for psychiatric care following an incident at school in which he reacted with violence after being hit by a teacher.  While hospitalized, Mr. Woods was medicated with Ritalin and desipramine.  After his release, Mr. Woods was sent

10

to a school adjacent to the Children's Hospital to attend a program to help him re-adjust to a traditional education setting.

<u>Initial Placement in Administrative Segregation</u>

35.    On April 1, 2009, Mr. Woods was committed to the care and custody of DOCCS at the age of 30 for murder, attempted murder, and three counts of criminal possession of a weapon.

36.    Prison officials have authority to punish prisoners who break prison rules and regulations as well as prisoners who break the law.  Officials may place these prisoners into Disciplinary Seg as punishment.  However, prisoners may only be placed into Disciplinary Seg for a specified time period following a Tier III Hearing wherein prison officials must provide the accused inmate with written notice of the charges, including the specific date, time and place of the alleged misconduct, as well as enough additional information to enable the inmate to prepare a defense.  Officials also have the authority to place prisoners into Ad Seg, in instances where officials deem that the prisoner's presence threatens the safety and security of the prison.  Unlike Disciplinary Seg, Ad Seg does not require that the inmate be placed in a special housing unit for a specified time period.  Instead, the prisoner is placed into Ad Seg and his or her status is periodically reviewed to determine if continued segregation is warranted.  Mr. Woods entered into DOCCS's and Defendants' custody at Downstate on April 10, 2009 and was immediately placed into Ad Seg in the form of solitary confinement.

37.    The initial recommendation regarding Mr. Woods's placement, from Correction Officer "C. Olmsted," stated that "[b]ased upon information received from [New York City Department of Correctional Services ("NYCDOCS")] concerning [Mr. Woods's] combined involvement of group/gang affiliation and conspiring to receive contraband and special privileges from several NYCDOCS employees, it is this writer[']s recommendation [Mr. Woods]

11

be placed in administrative segregation for the safety and security of this facility and its

employees, as well as Inmate Woods['s] safety."

38.    Mr. Woods was not, and has never been, a member of a gang.  DOCCS never

presented any evidence to support its assertions regarding Mr. Woods's alleged gang affiliation.

39.    C. Olmsted's speculation produced the same devastating result as a guilty

determination after a disciplinary hearing, and potentially worse because the solitary

confinement in Ad Seg is indefinite.  Even though Mr. Woods had not violated any prison rules,

from the beginning of his incarceration, he was placed into Ad Seg, where the conditions were

identical to the conditions of Disciplinary Seg.

Conditions of Solitary Confinement

40.    Mr. Woods has spent the past ten years in solitary confinement.  The basis for his

solitary confinement has alternated between Ad Seg and Disciplinary Seg, but the conditions

have remained the same.

41.    Whether in solitary confinement for Ad Seg or Disciplinary Seg, Mr. Woods is

kept under conditions of extreme isolation, sensory deprivation, and restricted movement.

Unlike the general population, he is denied all vocational, cultural, and social opportunities.  He

has severely limited recreational and religious opportunities, limited access to personal property,

and limited contact with family and friends.

42.    Mr. Woods is housed in a single-occupancy, 7-foot by 9-foot concrete cell for at

least 23 hours per day.  Because his cell has flooded in the past, he sleeps on the floor in order to

keep his paperwork elevated and dry.

43.     He is permitted one hour of outdoor recreation each day, which takes place in an

empty cage – a pen enclosed by fencing with no other equipment.  Mr. Woods does not have

access to group recreation nor the opportunity to interact with other people, even during this

single hour of recreation.  Further, Mr. Woods's allotted one hour of outdoor recreation is often inaccessible due to the cold temperatures in northern New York and DOCCS's refusal to allow him additional clothes to wear in the outdoor cage.

44.    Mr. Woods is further denied access to opportunities for group meals, group education, or group prayer.  He receives all his meals through a slot in his door and eats alone in his cell.  Additionally, Mr. Woods is not permitted to attend therapeutic groups or programs for his mental health and behavioral needs.

45.    Mr. Woods has limited human interaction.  His only daily human interaction is usually with correctional officers or medical staff for a few minutes at a time.  He is permitted one phone call per month and allowed to see visitors once a week.

46.    Mr. Woods is not permitted to interact with other inmates.  He cannot see the other inmates.  The only way inmates can interact with the other prisoners is to yell to one another from their respective cells.  However, inmates risk disciplinary sanctions for yelling in their cells.  Despite this risk, many inmates in SHU do yell to communicate with one another.  Because of this constant yelling by the other prisoners, Mr. Woods is never allowed a moment of silence.

47.    Mr. Woods is not permitted to have more than four bags of personal property at any time.  If he does accumulate more than four bags of property, his personal items, including books, photos, magazines, mail, and clothes, are confiscated.

Medical and Mental Health Consequences of Solitary Confinement

48.    Mr. Woods suffers from serious medical conditions, which have been caused or exacerbated by his over ten years of continued isolated confinement.

49.    In addition to being deprived of the minimal civilized measure of life's necessities as described above, Mr. Woods also experiences unrelenting and crushing mental anguish, as

well as physical pain and suffering as a result of the years he has spent deprived of normal human interaction in stark and restrictive conditions, without any hope of release or relief.

50.    The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental and physical harm and places them at grave risk of even more devastating psychological harm.  All individuals are at risk of harm from these consequences, not just those with pre-existing health conditions.

51.    Mental health professionals have repeatedly and strongly cautioned against the use of solitary confinement in light of the serious, often irreversible, damage it causes.  Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.[2]  Mr. Woods has experienced all these injuries.

52.    Even brief periods of solitary confinement can result in serious and debilitating physical consequences.[3]  Individuals held in solitary confinement for even a short period of time commonly experience sleep disturbances, headaches, lethargy, dizziness, heart palpitations, appetite loss, weight loss, severe digestive problems, diaphoresis (excessive sweating, as

---

[2] *See Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006)).

[3] *See* Craig Haney's testimony and the Statement of the Physicians for Human Rights made and submitted to the Senate Judiciary Committee on the Constitution, Civil Rights and Human Rights Hearing on Solitary Confinement, June 19, 2012. Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 12–13 (2012), *available* at https://www.judiciary.senate.gov/imo/media/doc/12-6-19HaneyTestimony.pdf.

experienced by people in shock), back pain, joint pain, deterioration of eyesight, shaking, feeling cold, and the aggravation of pre-existing medical conditions.[4]

53.     Mr. Woods has experienced many of these physical conditions, including loss of appetite and severe weight loss, persistent pain, aggravation of a pre-existing knee injury which makes walking difficult, severe digestive problems, hemorrhoids, polyps, bald spots, deterioration of eyesight and hearing, skin growths, and an injured foot and left shoulder.

54.     Prolonged solitary confinement also causes severe psychiatric harm.  Those held in solitary confinement may experience hypersensitivity to external stimuli, auditory and visual hallucinations, panic attacks, obsessive thoughts, paranoia, and decreased impulse control.[5]

55.     Serious forms of mental illness can either develop from or be exacerbated by even short periods of isolation.  The symptoms of these illnesses include significantly increased negative attitudes and affect, irritability, anger, aggression, rage, fear of impending emotional breakdowns, a loss of control, and panic attacks.[6]

56.     The most devastating consequence of solitary confinement is the high risk of self-harm.  The American Psychiatric Association has warned that prisoners with an elevated risk for suicide should never be placed in solitary confinement.[7]  An American Journal of Public Health study confirmed the real and serious danger of self-harm, finding that prisoners in solitary

---

[4] *See* Physicians for Human Rights, Buried Alive: Solitary Confinement in the US Detention System 1–2 (April 2013), available at https://phr.org/wp-content/uploads/2013/04/Solitary-Confinement-April-2013-full.pdf.

[5] *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y at 333.

[6] *See* Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 10–11 (2012).

[7] *See* American Psychiatric Association, APA Position Statement on Segregation of Prisoners with Mental Illness (2012).

confinement are seven times more likely to harm themselves than those housed in general population.[8]

57.     Defendants were well aware that Mr. Woods was at risk of suicidal behavior and self-harm prior to his confinement in Ad Seg.  Mr. Woods's first attempt to commit suicide while under supervision occurred in 2007, as he awaited trial.  Although Mr. Woods informed the corrections personnel of his suicidal thoughts, they failed to treat him and instead offered him cigarettes and matches.  During this suicide attempt, Mr. Woods set his blankets and sheets on fire.  Despite seeing the fire, corrections personnel left him in his cell for seven to ten additional minutes.  As a result, Mr. Woods suffered substantial burns which are still evident on his arms.  Mr. Woods was subsequently admitted to Central New York Psychiatric Center ("CNYPC"), a state in-patient psychiatric hospital for prisoners.

58.     Despite these warning signs, Defendants knowingly exacerbated Mr. Woods's mental health conditions.  Mr. Woods has engaged in self-harm consistently and attempted suicide multiple times prior to and throughout his ten years in solitary confinement.

59.     In 2012, Mr. Woods lost privileges to his razor because he cut himself, with no evidence that the Defendants escalated his mental health treatment at this time.

60.     On May 6, 2016, Mr. Woods was admitted to the Residential Crisis Treatment Program ("RCTP") for expressing thoughts of suicide.

61.     The purpose of an RCTP is to provide immediate, temporary mental health observation and monitoring in order to determine whether the prisoner can be returned to SHU or if he needs in-patient care at the CNYPC.

---

[8] See Kaba Fatos, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates,* 104 Am. J. Pub. Health 442 (2014).

62.    Mr. Woods told the registered nurse with whom he spoke at the time that he wanted to end his life.  He had a clear suicide plan, which included obtaining a razor and using it, or hanging himself.

63.    Mr. Woods stayed at the RCTP until May 17, 2016.  The next day, Mr. Woods was again placed on suicide watch and then fully readmitted to RCTP on June 2, 2016. Mr. Woods continued to vividly describe his plans to take his own life if returned to Ad Seg, plans purportedly encouraged by his hearing voices of the dead.  On June 27, Mr. Woods reported that he simply wanted the voices to stop.  His desire to take his own life intensified as the anniversary of his crime, July 9, approached.

64.    RCTP conditions typically include extreme isolation.  RCTP patients are often held in solitary observation cells twenty-four hours per day, clothed in a paper smock with no personal items, while OMH Service Providers evaluate their mental health and determine treatment.

65.    On July 9, 2016, while in RCTP, Mr. Woods again attempted to commit suicide by ingesting not only over a week's worth of medication, but also by swallowing a metal object, a piece of his bunk bed.  He was treated and remained in RCTP until July 26, 2016.

66.    In describing his reasons for attempting suicide, Mr. Woods stated that he could no longer bear the time in solitary confinement, and noted that his time in solitary confinement had destroyed his relationships, including his marriage.

67.    Defendants are aware of the harms caused Mr. Woods by solitary confinement, which are recorded in DOCCS's records and its scoring system of mental health.  A Mental Health Level 6 indicates the prisoner requires minimal mental health services, while a Mental Health Level 1 indicates the highest level of need for mental health services.  Between May 2016

17

and March 2017, Mr. Woods was designated Level 3 at least three times, Level 2 at least twice, and Level 1 at least twice.

68.     Despite Plaintiff exhibiting clear signs of deteriorating mental condition, the Defendants continued to subject him to the solitary confinement that was causing him serious harm and failed to provide adequate mental health treatment to an inmate in crisis.

### Continued Placement in Administrative Segregation

69.     Since his initial placement in solitary confinement in April 2009, Mr. Woods has remained in solitary confinement for over a decade.

70.     In accordance with 7 N.Y.C.R.R. § 301.4, DOCCS must conduct a review of Mr. Woods's Ad Seg status every thirty days.  Section 301.4 requires the committee to review the prisoner's institutional record and write a report setting forth:  "(i) reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude; and (iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation."

71.     Although DOCCS has purported to conduct official Ad Seg reviews, Mr. Woods has not received meaningful reviews of his Ad Seg status.  This is amply illustrated by the numerous factual errors that Defendants continue to cite and rely upon, despite the inaccuracies that have been repeatedly brought to each Defendant's attention, such as repeated references to a gang affiliation that does not exist.

72.     Instead, the reviews contain substantially similar language and use formulaic, boilerplate verbiage that does not consider any changed circumstances since the last review.

73.     Because of this, the Defendants denied Mr. Woods's right to due process through a meaningful review process.

74.    For example, from March 2010 to November 2016, Mr. Woods's reviews consisted of the same recitation of Mr. Woods's criminal history, details about his crime of conviction, and his decade-old disciplinary history from his earlier incarcerations between 1996 and 1999.

75.    The summary reports stated no other basis for retaining Mr. Woods in Ad Seg other than the above-referenced details.  The committee continued to recommend that Mr. Woods's release into general population would pose an extreme risk to staff, inmates, and the safety, security, and order of the facility, without further justification.  Despite the lack of any justification supporting such recommendations, all other Defendants continued or continue the imposition of solitary confinement.

76.    Mr. Woods's Ad Seg status did not change even during periods of time when his positive behavior was acknowledged by DOCCS.

77.    For example, in his March 2, 2010 review, despite commenting that "Inmate Woods has not been a management problem to date since being placed in Ad[] Seg[] [s]tatus" and noting that "[h]e exercises and showers on a regular basis," the Deputy Commissioner for Correctional Facilities nonetheless determined that Mr. Woods must continue to remain in Ad Seg.

78.    As another example, in his January 18, 2011 review, the review committee acknowledged that "no new misbehavior reports have been issued during this period."  However, it justified continuing to retain Mr. Woods in Ad Seg because "it is clear that he is not willing to follow rules and regulations."  Mr. Woods apparent transgression was that "[h]e has filed a grievance regarding assorted SHU issues and has also complained about his mail (both incoming and outgoing) during this review period."

79.    The review committee's perfunctory approach to reviewing Mr. Woods's status is especially apparent in its practice of copying nearly verbatim comments in subsequent reviews, even when adding further, contradictory comments.  For example, in his March 2, 2010 review at Clinton, the committee wrote the following comment that has appeared identically in his reviews since that date: "Inmate Woods has not been a management problem to date since being placed in Ad[] Seg[] status.  He exercises and showers on a regular basis.  He receives regular visits."  But, in addition, the committee also wrote "Woods has proved himself to be a severe management problem."

80.    In Mr. Woods's May 18, 2018 review, Defendants wrote the same statement they had written innumerable times before:  "He has demonstrated an aptitude for introducing contraband into a correctional facility."  This statement comes out of a December 2012 Unusual Incident Report, where Mr. Woods was accused of smuggling marijuana into Clinton.  After three years of administrative appeals, which culminated in a case in the Appellate Division of the Third Department, DOCCS administratively reversed Mr. Woods's guilty disciplinary determination and promised to expunge any references from Mr. Woods's record.  Instead, this incident, where Mr. Woods was wrongly accused of smuggling, stays with him to this day, in yet another inaccurate Ad Seg review.

81.    Additionally, in this May 2018 review, Defendants cited minor misbehavior reports from over a year and a half prior, not assessing his behavior at the time of the review, further demonstrating Defendants' sham reviews in violation of the Constitution.

82.    Mr. Woods routinely submits an inmate statement and appeal of his reviews.  His appeals are not referenced or meaningfully addressed by any of the Defendants.

<u>Prolonged Solitary Confinement through Disciplinary Segregation</u>

83.    Defendants have prolonged Mr. Woods's solitary confinement by issuing a series of disproportionate disciplinary sanctions for innocuous conduct or minor violations.  All Defendants are implicated during the time period relevant to this Complaint, including Prack and Venettozzi.

84.    For example, on April 30, 2015, Mr. Woods was moving to a different cell and requested that his mattress from his old cell be transferred with him because it was a "medically issued mattress."  When he was unable to produce a medical permit, he received a disciplinary ticket for making a false statement and received thirty days in Disciplinary Seg.

85.    As another example, on March 4, 2016, Mr. Woods asked a pregnant nurse who was administering medication, "So when is your due date?"  The nurse told him not to ask her personal questions and Mr. Woods replied, "Well, I just want to know for when you go out."  For this attempt to make conversation, Mr. Woods lost his daily hour of recreation time for thirty days.

86.    On July 11, 2017, Mr. Woods allegedly stated that he was unhappy with his meal because there were bugs and hair on his tray.  He stuck his hands out of the feed-up slot and did not put them back in his cell when ordered to do so.  Mr. Woods stated that he could not hear the order from the officer because his hearing aid needed batteries.  For this, Mr. Woods received sixty days in Disciplinary Seg.

87.    Defendants harassed and abused Mr. Woods.  Two days after the previous incident, a similar event took place.  Moreover, throughout the record of Mr. Woods's time in solitary confinement, incidents of the Defendants and other corrections officers tampering with Mr. Woods's food, appear.

88.    Additionally, records such as the Superintendent Hearing Disposition Rendered report from July 13, 2017, consistently indicate that video of the alleged disciplinary acts "cannot be retrieved."  The Defendants' frequent mishandling of video evidence before a Tier III hearing, which Mr. Woods has grieved, denied Mr. Woods due process and thus violated the Constitution.

89.    Moreover, the reviews frequently failed to consider Mr. Woods's mental state, even when he was classified as a Mental Health Level 1; the Defendants did not consider that in his Tier III hearings.  Ignoring Mr. Woods's mental health during this hearing again violated the Due Process Clause of the Constitution, and regulations promulgated at the direction of the state legislature.

90.    Rather than acknowledge that Mr. Woods's indefinite solitary confinement contributes to his acting out in attention-seeking, and non-violent ways, each of the Defendants have disproportionately penalized Mr. Woods by adding consecutive time to the disciplinary sanctions imposed.  Simply put, no matter what Mr. Woods does, good or bad, the result is the same.

91.    On the basis of these and other disciplinary sanctions, Mr. Woods was not scheduled to be released from Disciplinary Seg until May 2020.  In effect, the solitary confinement continues, whether under the guise of disciplinary sanction or of Ad Seg.

92.    In the latest Ad Seg review that is available to counsel, from January 29, 2019, the language is substantially the same as Mr. Woods's reviews from his earliest days in Ad Seg.  The committee's recommendation in Mr. Wood's January 29, 2019 review concludes by reiterating language that appears in each of Mr. Wood's reviews, regardless of his behavior: that Mr. Woods remains a "threat" to the security of the facility.  In Mr. Wood's January 29, 2019 Ad Seg Review, the committee restates Mr. Wood's past incarcerations and misbehavior reports dating

back to 2009, the beginning of his current sentence.  The committee reports that while Mr. Woods has only displayed positive behavior in his current review period and has kept appropriate cell conditions and personal hygiene, they would "like to see [his] behavior continue for a significant period before considering a move to a less restrictive environment."  Mr. Woods had already had no misbehavior reports in over eight months.  Even with the positive behavior, the committee recommended that Mr. Woods remain in Ad Seg and the Superintendent continued to impose the extraordinary condition of solitary confinement without meaningful assessment of the relevant facts, including Mr. Woods's good behavior, and Mr. Woods remains in solitary confinement to this day.

Defendants' Actions and Omissions Caused Violations of Mr. Woods's Constitutional Rights

93.     The Defendants had the authority and indeed were required to conduct meaningful reviews of Mr. Woods's Ad Seg status.

94.     Defendants knew that being confined in solitary confinement would deprive Mr. Woods of basic life necessities, basic human dignity, and the right to be free from cruel and unusual punishment.

95.     Defendants were explicitly made aware, through written grievances, written complaints, Mr. Woods's attempted suicide, and his abuse at the hands of prison guards, that Mr. Woods was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement.

96.     Accordingly, Defendants knew that subjecting Mr. Woods, who suffered from mental illness and had attempted suicide, to prolonged periods of time in solitary confinement consituted cruel and unusual punishment.

97.     Instead, and in the face of reports about his positive behavior, Defendants failed to provide Mr. Woods with meaningful reviews of his Ad Seg status and failed to transfer him from Ad Seg for nearly a decade.

98.     Additionally, as Mr. Woods's health further deteriorated, Defendants tacked on additional Disciplinary Seg in an amount disproportionate to the level of misbehavior.

99.     These failures deprived Mr. Woods of his constitutional rights to be free from cruel and unusual punishment, to receive due process in the form of meaningful and timely periodic reviews of his detention in Ad Seg, and to be free from grossly disproportionate sentences.

100.    As a direct result of Defendants' actions, Mr. Woods has suffered and continues to suffer severe mental anguish.

<u>Defendants' Discrimination and Failure to Accommodate Mr. Woods on the Basis of His Disabilities</u>

101.    Defendants have refused to modify their SHU policies and practices to accommodate Mr. Wood's disabilities and protect him from harm caused by solitary confinement.

102.    Since DOCCS placed him in solitary confinement more than ten years ago, Mr. Woods has suffered from ongoing and severe mental health issues related to and caused by prolonged isolation.  Mr. Woods has not had access to the programs and treatment that can alleviate his mental health issues.  Upon information and belief, the denial of programming and treatment was based on Mr. Woods's confinement in SHU.

103.     Defendants are well aware of the harms associated with its solitary confinement policies and practices, as they have acknowledged the associated risks in other lawsuits.[9] However, Defendants have failed to modify its policies and procedures to reasonably accommodate Mr. Woods's disabilities by, among other things: (1) failing to modify its policies and procedures to ensure that Mr. Woods is not placed in prolonged isolation, which caused and exacerbated his mental health symptoms; (2) failing to modify its policies and procedures to ensure that Mr. Woods's disabilities are considered in the initial and continued placement in solitary confinement; and (3) failing to modify its policies and procedures to ensure that Mr. Woods is offered adequate out-of-cell time, social interaction, environmental stimulation, and mental health treatment to prevent worsening of his mental health symptoms while he is in solitary confinement.

104.     Defendants have also discriminated against Mr. Woods on the basis of his disabilities by issuing a series of disproportionate disciplinary sanctions for innocuous conduct or non-violent violations related to Mr. Woods's mental health symptoms.  Despite the obvious harm to Mr. Woods, Defendants extended his time in SHU for each disciplinary infraction, resulting in Mr. Woods cumulatively remaining in SHU for over ten years.

<u>Mr. Woods Has Exhausted All Administrative Remedies</u>

105.     In February and May 2017, while housed in SHU at Great Meadow Correctional Facility, Mr. Woods submitted grievances challenging his continuous and ongoing SHU confinement through DOCCS's Inmate Grievance Program.  He received responses from the Inmate Grievance Review Committee denying his grievances.  He appealed to the Superintendent, who also denied his grievances.  He appealed the Superintendent's decisions to

---

[9] *See, e.g.*, Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694 (S.D.N.Y. Apr. 1, 2016), ECF No. 331.

the Central Office Review Committee ("CORC") of the Inmate Grievance Program, which issued a final denial of his grievances on August 1, 2017, stating that "Administrative Segregation is not a grievable issue" and that "[a]ll matters referring to this issue must be addressed through proper channels."

106.    Mr. Woods submitted grievances challenging his continuous confinement in 2018 and 2019, as well, putting each Defendant in this case on notice of the challenged unconstitutional behavior.

<u>Our Evolving Standards of Decency Demand Significant Limits on the Use of Prolonged Solitary Confinement</u>

107.    Recognizing the severe and often irreversible harm caused by solitary confinement, a wide range of highly regarded professional groups and international organizations have publicly announced their commitment to sharply limiting or abolishing solitary confinement.  Medical health professional associations, legal organizations, prisoner re-entry organizations, correctional organizations, religious organizations, and international human rights bodies echo scientific research admonishing the use of solitary confinement.

108.    The nation's most highly regarded medical health professional organizations have condemned the use of solitary confinement, particularly its use on adolescents and those with mental illness.

109.    The American Psychiatric Association has stated that, with "rare exception," prisoners with mental illnesses should never be subjected to prolonged isolation, due to the real and serious potential for harm.[10]  The American Academy of Child and Adolescent Psychiatry

---

[10] *See* American Psychiatric Association, *APA Position Statement on Segregation of Prisoners with Mental Illness* (2012), available at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Psychiatric-Services-in-Adult-Correctional-Facilities.pdf.

similarly noted that "the potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis."[11]

110.    Notably, the National Commission on Correctional Health Care ("NCCHC") has declared that solitary confinement for longer than fifteen consecutive days is "cruel, inhumane and degrading treatment, and harmful to an individual's health," and advises that "[h]ealth care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided."[12]  In its Position Statement on Solitary Confinement, the NCCHC reports that "[t]hose in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."[13]

111.    Professional legal organizations recommend serious restrictions on the use of solitary confinement.  The New York State Bar Association has stated that "solitary confinement, if used at all, should be measured in *days*, not years, months, or even weeks."[14] The American Bar Association has stated that only the most severe disciplinary offenses, in which safety and security are seriously threatened, ordinarily warrant a sanction that exceeds thirty days' placement in disciplinary housing.[15]

---

[11] *See* Solitary Confinement of Juvenile Offenders (Approved by Council, Apr. 2012), available at https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile _Offenders.aspx (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y, 325, 325-83 (2006)).
[12] National Commission on Correctional Healthcare, *Solitary Confinement (Isolation)* (2016), available at https://www.ncchc.org/solitary-confinement.
[13] *Id.*
[14] *See* N.Y. State B. Ass'n. Comm. On Civ. Rts. Report to the House of Delegates, *Solitary Confinement in New York* State, 1, 21 (Approved on Jan. 25, 2013) *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (emphasis in original).
[15] American Bar Association, Standards on Treatment of Prisoners (2011), available at https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatmen t_of_Prisoners.pdf.

112.     International human rights bodies have condemned the use of solitary confinement and issued direct pleas to the United States to halt its continued use of the practice. The United Nations Special Rapporteur on Torture has concluded that fifteen days in solitary confinement is considered cruel, inhuman, or degrading treatment or punishment—in other words, torture.[16] The United Nations Committee Against Torture has expressed great concern over the frequent use of prolonged isolation and has recommended the United States "[l]imit the use of solitary confinement as a measure of last resort, for as short a time as possible[.]"[17]

113.     Religious leaders from diverse spiritual backgrounds are also united against the continued use of solitary confinement.[18]

114.     Nationwide, state and federal legislators have responded to the growing call to abolish the practice of solitary confinement. The Senate Judiciary Subcommittee on the Constitution, Human Rights, and Civil Rights has held a series of congressional hearings to investigate the widespread use of solitary confinement and the attendant harms.[19]

---

[16] *See* Juan E. Mendez, Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011) *available at* https://documents-dds-ny.un.org/doc/UNDOC/ GEN/N11/445/70/PDF/N1144570.pdf?OpenElement.

[17] *See* U.N. Comm. Against Torture, Concluding Observations on the Combined Third to Fifth Periodic Reports of United States of America (Dec. 19, 2014), available at https://digitallibrary.un.org/record/790513?ln=en#record-files-collapse-header.

[18] *See, e.g.*, Francis X. Rocca, National Catholic Reporter, Pope Francis Calls for Abolishing Death Penalty and Life Imprisonment (Oct. 23, 2014) ), available at https://www.ncronline.org/blogs/francis-chronicles/pope-francis-calls-abolishing-death-penalty-and-life-imprisonment; 220th General Assembly of the Presbyterian Church (USA), Commissioner's Resolution on Prolonged Solitary Confinement in U.S. Prisons (2012), available at https://www.pc-biz.org/#/search/4389; The Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (Passed by the Rabbinical Assembly Plenum May 2012), available at https://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation.

[19] *See* U.S. S. Judiciary Subcomm. on Const., Human Rights, & Civ. Rts., Hearing on "Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety

115.    Former President Barack Obama criticized the nation's widespread use of long-term solitary confinement, especially with respect to juveniles and those with mental illness, in light of the overwhelming evidence of the severe and long-term effects of solitary confinement. In order to increase the likelihood of successful re-entry, President Obama announced that he would be adopting the recommendations of the Department of Justice as applied to the federal prison system, "banning the use of solitary confinement for juveniles and as a response to low-level infractions, expanding treatment for the mentally ill and increasing the amount of time prisoners in solitary can spend outside of their cells."[20]

116.    DOCCS has already acknowledged the harms caused by solitary confinement and agreed to limit its use of the practice in some contexts and for some populations.

117.    In the *Peoples v. Fischer* settlement, DOCCS acknowledged the harm SHU causes and agreed to systemic changes including providing progressive behavioral incentives for prisoners in SHU, additioanl beds in behavioral alternative units, and guidelines for Hearing Officers to consider when imposing SHU sanctions.[21]

118.    While a step in the right direction, the *Fisher* settlement is insufficient to remedy the severe harms endured by Mr. Woods and numerous others because there continues to be no

---

Consequences" (June 19, 2012; Feb. 25, 2014), available at https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-the-human-rights-fiscal-and-public-safety-consequences and https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-ii-the-human-rights-fiscal-and-public-safety-consequences.

[20] *See* President Barack Obama, Opinion, Barack Obama: Why We Must Rethink Solitary Confinement, Wash. Post, Jan. 25, 2016.

[21] *See* Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694, (S.D.N.Y. Apr. 1, 2016), ECF No. 331.

limit to the accumulation of continuous SHU time.  The settlement provides no relief to prisoners

placed in solitary confinement under Ad Seg status.[22]

## LEGAL CLAIMS

### I.    FIRST CAUSE OF ACTION
Violations Of The Eighth Amendment For Imposing Cruel And Unusual
Punishments That Contravene Standards Of Decency

119.    Mr. Woods repeats and incorporates the allegations set forth in all of the

foregoing paragraphs of this Complaint as though fully set forth herein.

120.    At all relevant times, each of the Defendants acted under color of state law.

121.    Mr. Woods was at all times dependent on the Defendants to protect him from

harm and to provide for his basic needs.

122.    The acts and omissions of the Defendants, which resulted in Mr. Wood's

continuous solitary confinement for over ten years, contravene standards of decency against the

use of long-term solitary confinement.

123.    By their use of the policies and practices described herein, the Defendants caused

Mr. Woods to suffer severe harm by knowingly disregarding the substantial risk that being

confined in solitary confinement would deprive Mr. Woods of life's necessities, basic human

dignity, and right to be free from cruel and unusual punishment under the Eighth Amendment to

the United States Constitution.

124.    The Defendants' actions have deprived Mr. Woods of basic human needs, such as

normal human contact, environmental and sensory stimulation, mental and physical health,

physical exercise, sleep, nutrition, and meaningful activity.  Extremely prolonged deprivation of

these basic human needs has inflicted serious psychological and physical pain and suffering, as

---

[22] *Id*. at 28 ("Nothing in this section precludes the continued selective use of Protective Custody or Administrative Segregation in accordance with established procedures.").

well as permanent psychological and physical injury on Mr. Woods. This deprivation of basic human needs, resulting from the cumulative effect of extremely prolonged isolated confinement and the crushing conditions of that confinement, poses a continuing serious and substantial risk of harm.

125.    The risk of harm that Mr. Woods faced and continues to face by being placed in solitary confinement was and continues to be so obvious that knowledge may be inferred under these circumstances. It was patently obvious to the Defendants, and to any reasonable person, that the conditions imposed on Mr. Woods over many years would cause tremendous mental anguish, suffering, and pain.

126.    The Defendants' deliberate indifference to Mr. Woods's pain and suffering constitutes more than mere negligence because the Defendants were repeatedly and explicitly made aware, through administrative grievances and written complaints, that Mr. Woods was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement in Ad Seg. As such, these circumstances fully support the conclusion that the Defendants had knowledge of the risk of harm that Mr. Woods faced in solitary confinement.

127.    The policies and practices complained of herein have been implemented by the Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law.

128.    The Defendants, who directly participated in violating standards of decency, are the Superintendent Defendants. Miller, Artus, and Coveny are sued in their individual and official capacity for monetary, declaratory, and injunctive relief. Rock and Noeth are sued in their individual capacity for monetary damages.

129.    Annucci, O'Gorman, Bellnier, Prack, and Venettozzi are sued in their official

capacity for declaratory and injunctive relief, as they knowingly allowed the policies and

customs that permitted these Eighth Amendment violations to continue under their supervision

and authority.

## II.    SECOND CAUSE OF ACTION
Violations Of The Eighth Amendment For
Deliberate Indifference To Serious Medical Needs

130.    Mr. Woods repeats and incorporates the allegations set forth in all of the

foregoing paragraphs of this Complaint as though fully set forth herein.

131.    With deliberate indifference to Mr. Woods's serious and obvious medical needs,

known disregard of standards of decency, and notice of his deterioration, the Defendants

repeatedly imposed consecutive periods of solitary confinement as punishment, which they knew

created a substantial risk of harm to Mr. Woods.

132.    Mr. Woods's medical needs significantly affect his daily activities.  If Mr. Woods

had received proper treatment or evaluation, a reasonable doctor would have perceived

Mr. Woods's physical and psychological medical needs as important and worthy of treatment.

Further, Mr. Woods's psychological and physical conditions are conditions that, if left untreated,

may result in further significant psychological or physical injury, and unnecessary suffering.

133.    Despite this knowledge, Defendants failed to respond reasonably and thus were

deliberately indifferent to Mr. Woods's serious and obvious medical needs.  This failure to

respond reasonably constituted more than inadvertent failure to provide adequate medical care.

134.    With deliberate indifference to Mr. Woods's serious and obvious medical needs,

knowing disregard of standards of decency, and notice of Mr. Woods's deterioration, the

Defendants repeatedly imposed consecutive periods of solitary confinement as punishment, even

though they knew it would create a substantial risk of harm to Mr. Woods.  As such, the

Defendants' deliberate indifference undoubtedly exacerbated Mr. Woods's physical and

psychological medical conditions.

135.    Each of the currently employed Defendants is sued in his individual and official

capacity for declaratory, injunctive, and monetary relief for so acting with deliberate indifference

to Mr. Woods's serious medical needs, and for permitting violations to continue under their

watch.  Each of the formerly employed Defendants is sued in his individual capacity for

monetary damages.

### III.    THIRD CAUSE OF ACTION
<u>Violations Of The Eighth Amendment For Imposing
Grossly Disproportionate Sentences To Solitary Confinement That
Serve No Legitimate Penological Purposes</u>

136.    Mr. Woods repeats and incorporates the allegations set forth in all of the

foregoing paragraphs of this Complaint as though fully set forth herein.

137.    The Defendants' policy of indefinite and prolonged isolated confinement imposed

disproportionate punishment on Mr. Woods.  The Defendants had no legitimate penological

interest in retaining Mr. Woods in the debilitating conditions of Ad Seg solitary confinement.

138.    By their acts and omissions, the Defendants have subjected Mr. Woods to a

decade-long solitary confinement, have inflicted significant psychological and physical harm,

and have subjected him to the risk of future debilitating harm, although Mr. Woods has not

committed any serious infraction since his placement in Ad Seg.  This confinement serves no

legitimate, penological purpose and is a grossly disproportionate punishment, which violates

Mr. Woods's Eighth Amendment right to be free from cruel and unusual punishment.

139.    Each of the currently employed Defendants is sued in his individual and official

capacity for declaratory, injunctive, and monetary relief for subjecting Mr. Woods to grossly

disproportionate terms of solitary confinement. Each of the formerly employed Defendants is sued in his individual capacity for monetary damages.

## IV.    FOURTH CAUSE OF ACTION
Violations Of The Fourteenth Amendment Right To
Procedural Due Process For Lack of Meaningful Review

140.    Mr. Woods repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

141.    The Defendants have deprived Mr. Woods of a protected liberty interest in avoiding long-term solitary confinement. The Defendants have denied Mr. Woods of both meaningful and timely periodic review of his detention in Ad Seg, as well as meaningful notice of what he must do to earn release, in violation of the Fourteenth Amendment.

142.    Because indefinite placement in Ad Seg constitutes a significant and uncommon hardship, Mr. Woods is entitled to meaningful notice of how he may alter his behavior to rejoin general population or be placed in other less restrictive housing, as well as meaningful and timely periodic reviews to determine whether he still warrants detention in Ad Seg.

143.    All Defendants, including the SHMC Defendants, have denied Mr. Woods of any such notice or meaningful review by: (1) failing to provide Mr. Woods with notice of what actions he can take in order to be released from Ad Seg; (2) providing misleading notice that Mr. Woods can become eligible to be released from Ad Seg by maintaining "positive" behavior for a significant period, when in fact Mr. Woods had maintained positive behavior yet was still housed in Ad Seg; (3) making a predetermination that Mr. Woods will stay in Ad Seg, thus rendering the periodic reviews procedurally meaningless; (4) failing to consider Mr. Woods's changes in behavior over time and whether he remained a security risk to justify his continuous confinement in Ad Seg; and (5) failing to conduct timely reviews and/or provide him with those

reviews, thus precluding Mr. Woods from responding, participating, or providing additional information and precluding the review committee themselves from conducting meaningful review.

144.    The Defendants' actions are in violation of Mr. Woods's due process rights under the Fourteenth Amendment to the United States Constitution.

145.    Each of the currently employed Defendants is sued in his individual and official capacity for declaratory, injunctive, and monetary relief for depriving Mr. Woods of his due process right to meaningful review.  Each of the formerly employed Defendants is sued in his individual capacity for monetary damages.

**V.    FIFTH CAUSE OF ACTION**
Violations Of The *Americans With Disabilities Act*

146.    Mr. Woods repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

147.    Mr. Woods is a qualified individual with disabilities as defined in the Americans with Disabilities Act ("ADA").  He has mental and physical impairments that substantially limit one or more major life activities; he has records of these impairments; and he is regarded as having such impairments.  42 U.S.C. §§ 12102(2), 12131(2).

148.    Mr. Woods is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody within the meaning of Title II of the ADA.  By virtue of his confinement in Ad Seg, Mr. Woods is precluded from participating in services, programs, and activities, and from receiving any benefits provided to incarcerated people in DOCCS custody.

149.    Annucci, O'Gorman, and Bellnier violate the ADA by failing to ensure that Mr. Woods, a qualified individual with disabilities as defined by the ADA, has access to, is

permitted to participate in, and is not denied the benefits of, the programs, services, and activities provided by Defendants.  42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

150.    Annucci, O'Gorman, and Bellnier violate the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination against Mr. Woods on the basis of his disability.  28 C.F.R. § 35.130(b)(7).

151.    Annucci, O'Gorman, and Bellnier discriminate against Mr. Woods, a qualified individual with disabilities as defined by the ADA, by administering programs and services in a manner that denies Mr. Woods the opportunity to receive services in the most integrated setting appropriate to his needs.  28 C.F.R. § 35.152(b)(2).

152.    Annucci, O'Gorman, and Bellnier utilize criteria or methods of administration that have the effect of subjecting Mr. Woods to discrimination and that defeat or substantially impair accomplishment of objectives of DOCCS programs, services, and activities. 28 C.F.R. § 35.130(b)(3).

153.    As a result of Annucci's, O'Gorman's, and Bellnier's policies and practices, Mr. Woods has been unnecessarily placed and retained in isolation due to his disabilities; is denied equal access to activities, programs, and services for which he is otherwise qualified; and is denied the opportunity to receive services in the most integrated setting appropriate to his needs.

154.    As a direct and proximate cause of these actions and omissions, Mr. Woods has suffered and will continue to suffer from harm and violation of his ADA rights.  These harms will continue unless enjoined by this Court.

## VI.    SIXTH CAUSE OF ACTION
### Violations Of Section 504 Of The *Rehabilitation Act*

155.    Mr. Woods repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

156.    Mr. Woods is an individual with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. §§705(20), 794.

157.    Mr. Woods is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody within the meaning of Section 504 of the Rehabilitation Act.

158.    DOCCS is a program or activity receiving federal financial assistance within the meaning of the Rehabilitation Act.  29 U.S.C. § 794.

159.    Annucci, O'Gorman, and Bellnier exclude or excluded Mr. Woods from participation in, and deny him the benefits of, programs or activities, by reason of his disabilities. 29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a).

160.    Annucci, O'Gorman, and Bellnier discriminate or discriminated against Mr. Woods, a qualified individual with disabilities within the meaning of the Rehabilitation Act, by administering programs and services for individuals with disabilities in a manner that denies Mr. Woods the opportunity to receive services in the most integrated setting appropriate to his needs.  29 U.S.C. § 794; 45 C.F.R. § 84.4(b)(2).

161.    Annucci, O'Gorman, and Bellnier deny or denied Mr. Woods the opportunity afforded him to participate in programs or activities.  28 C.F.R. § 42.503(b)(1).

162.    Annucci, O'Gorman, and Bellnier utilize or utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of DOCCS programs or activities with respect to handicapped persons.  28 C.F.R. § 42.503(b)(3).

163.    Annucci, O'Gorman, and Bellnier violate or violated Section 504 of the Rehabilitation Act by failing to reasonably accommodate Mr. Woods, a qualified individual with disabilities within the meaning of the Rehabilitation Act, in its facilities, programs, activities, and services.

164.    As a result of Annucci's, O'Gorman's, and Bellnier's discrimination and failure to provide reasonable accommodations, Mr. Woods does not have equal access to DOCCS activities, programs, and services for which he is otherwise qualified.

165.    As a direct and proximate cause of these policies, practices, and omissions, Mr. Woods has suffered and will continue to suffer from harm and violation of his rights under Section 504 of the Rehabilitation Act.  These harms will continue unless enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff LEE WOODS respectfully asks that this Court:

1.    Declare that the DOCCS Defendants' acts and omissions violated and continue to violate Mr. Woods's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 of the Rehabilitation Act, and that these acts and omissions continue to cause an ongoing harm and violation of those rights;

2.    Issue injunctive relief ordering Defendants to ameliorate the conditions under which Mr. Woods is held and provide him with effective mental health treatment and programming;

3.    Enter judgment in favor of Mr. Woods for reasonable actual and compensatory, including consequential, damages against each of the Defendants, jointly and severally, to compensate Mr. Woods for his pain, suffering, and other hardships

arising from the Defendants' deliberate indifference to his medical needs and due process violations;

4.    Enter judgment for Mr. Woods for reasonable punitive damages against each of the Defendants;

5.    Award Mr. Woods the costs of this action, including reasonable attorneys' fees;

6.    Retain jurisdiction of this case until the Defendants have fully complied with the orders of this Court; and

7.    Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: November 10, 2020
New York, New York

By: /s/ James D. Arden
James D. Arden
Caitlin N. Matheny
Cassandra Liu
SIDLEY AUSTIN LLP
787 Seventh Ave
New York, NY 10019
Telephone: (212) 839-5889
jarden@sidley.com
cmatheny@sidley.com
cassandra.liu@sidley.com