**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LEE WOODS,

                                                    Plaintiff,                          9:20-cv-570 (BKS/CFH)

v.

DANIEL F. MARTUSCELLO, III,[1] et al.,

                                                    Defendants.

**Appearances:**

*For Plaintiff:*
Sara L. Mandelbaum
Ellen M. Dunn
Laura Sorice
Sharon Lee
Tyler J. Domino
Sidley Austin LLP
787 Seventh Ave.
New York, NY 10019

*For Defendants:*
Jennifer J. Corcoran
New York State Office of the Attorney General
The Capitol
Albany, NY 12224

---

[1] The operative pleading in this case names former Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") Anthony J. Annucci as a defendant.  Dkt. No. 180.  However, plaintiff's individual capacity claims against this official were previously dismissed, *see* Dkt. No. 89, and Mr. Annucci is no longer the Acting DOCCS Commissioner. Accordingly, the Court substitutes Acting DOCCS Commissioner Daniel F. Martuscello, III for Anthony J. Annucci in accordance with Rule 25(d) of the Federal Rules of Civil Procedure. The Clerk is directed to update the docket accordingly.

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Lee Woods brings this action under 42 U.S.C. § 1983 ("Section 1983") against the following Defendants asserting Eighth and Fourteenth Amendment violations stemming from the nature and duration of his restrictive confinement under both administrative segregation ("Ad Seg") status, and as a result of disciplinary sanctions that he received ("Disciplinary Seg"), for a period of approximately twelve years: (1) Acting DOCCS Commissioner Daniel F. Martuscello, in his official capacity; (2) former DOCCS Deputy Commissioner James O'Gorman; (3) former DOCCS Deputy Commissioner Joseph Bellnier; (4) Acting DOCCS Deputy Commissioner and former Superintendent of Attica Correctional Facility Joseph Noeth; (5) Superintendent of Great Meadow Correctional Facility Christopher Miller; (6) former Superintendent of Great Meadow Correctional Facility David Rock; (7) former Superintendent of Attica Correctional Facility Dale Artus; (8) former Superintendent of Elmira Correctional Facility John Rich; (9) Acting Superintendent of Mid-State Correctional Facility Mark Passage; (10) Acting Superintendent of Attica Correctional Facility Julia Wolcott; (11) former Director of DOCCS Special Housing and Inmate Disciplinary Program Donald Venettozzi; and (12) former Director of DOCCS Special Housing and Inmate Disciplinary Program Albert Prack.  (Dkt. No. 180.)  The second amended complaint contains four causes of action that remain in this case: (1) Eighth Amendment conditions-of-confinement claims against each of the named Defendants based on allegations that the restrictive nature of Plaintiff's confinement deprived him of "basic human needs"; (2) Eighth Amendment conditions-of-confinement claims against each of the named Defendants based on allegations that the duration of Plaintiff's restrictive confinement was excessive and at some point without legitimate penological justification; (3) Eighth Amendment medical

2

indifference claims against each of the named Defendants; and (4) Fourteenth Amendment procedural due process claims against each of the named Defendants. (*Id.* ¶¶ 122-148.)[2]

Presently before the Court are Plaintiff's motion for partial summary judgment (Dkt. No. 194) and Defendants' motion for summary judgment (Dkt. No. 195), both filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. Each motion is fully briefed, (Dkt. Nos. 194, 195, 200, 201, 204, 205). For the reasons that follow, Plaintiff's motion is denied and Defendants' motion is granted in part and denied in part.

## II.   FACTS[3]

### A.   Plaintiff's Restrictive Confinement

Plaintiff entered DOCCS' custody on April 9, 2009, after convictions for Murder, Aggravated Murder, and Second Degree Criminal Possession of a Weapon, arising out of his role in the killing of a police officer.  (Dkt. No. 201-1, ¶¶ 1, 5.)  Plaintiff is serving a life sentence for his crimes.  (*Id.*, ¶ 4.)

---

[2] By Order entered on September 13, 2021, this Court granted in part a motion to dismiss the following claims asserted in the amended complaint: (1) Plaintiff's Section 1983 individual capacity claims against former DOCCS Commissioner Annucci; and (2) Plaintiff's claims under Title II of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Rehabilitation Act"). (Dkt. No. 89 ("September 2021 Order").) As expressly noted in the second amended complaint, Plaintiff reasserts Section 1983 claims against Defendant Annucci in his individual capacity, as well as claims under the ADA and Rehabilitation Act, to preserve Plaintiff's rights on appeal. (*See* Dkt. No. 180 n.2, n.24, n.25.) However, for the reasons stated in the September 2021 Order, the Court once again dismisses these claims and declines to analyze them further herein.

[3] The facts are drawn from Plaintiff's Rule 56.1 Statement of Material Facts, (Dkt. No. 194-1), and Response to Defendants' Statement of Material Facts and Statement of Additional Material Facts, (Dkt. No. 201-1), as well as Defendants' Rule 56.1 Statement of Material Facts, (Dkt. No. 195-1), and Response to Plaintiff's Statement of Material Facts, (Dkt. No. 200-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. Because Plaintiff's Response to Defendants' Statement of Material Facts (Dkt. No. 201-1) and Defendants' Response to Plaintiff's Statement of Material Facts (Dkt. No. 200-1) show which facts are undisputed, and all of these facts are well-supported by pinpoint citations, as well as exhibits attached thereto, the Court largely relies on these responses for its recitation of the facts, which are undisputed unless otherwise noted. The facts are construed in the light most favorable to the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). The Court limits its consideration of the parties' motions to these facts, except where otherwise noted.

On April 10, 2009, DOCCS formally recommended that Plaintiff be placed on Ad Seg status based on a determination that "...his presence in general confinement of any correctional facility is an extreme threat and risk to staff and inmates as well as the safety, security, and good order of the facility." (Dkt. No. 201-1, ¶ 6.)[4]

Throughout Plaintiff's restrictive confinement under Ad Seg status, the conditions of his confinement were generally the same. (Dkt. No. 200-1, ¶ 2.) Plaintiff was primarily in Special Housing Unit ("SHU") cells and confined to his cell for at least 22 to 23 hours every day, with only an hour or two spent outside of the cell for solitary recreation time. (Dkt. No. 200-1, ¶ 5.) Plaintiff was also not allowed to leave his cell for meals, always restrained when traveling from one location in the prison to another and had more limited access to programming than inmates in general population. (Dkt. No. 201-1, ¶ 18(d); Dkt. No. 194-10 at 11.) For brief periods while on Ad Seg status, Plaintiff was housed in a Residential Crisis Treatment Program ("RCTP"), but the restrictive nature of his confinement remained virtually the same. (Dkt. No. 194-7; Dkt. No. 200-1, ¶ 3.)

In February 2012, Plaintiff was transferred to the RCTP after it was reported that he had engaged in self-harming behavior. (Dkt. No. 194-7.) On May 6, 2016, Plaintiff was once again transferred to the RCTP in response to him threatening to harm himself. (Dkt. No. 194-23.) Less than a month later, Plaintiff was transferred back to the RCTP in response to him threatening to harm himself and one or more officials believing he was engaging in "anxious" and "paranoid" behavior. (Dkt. No. 194-24.) Plaintiff would remain on Ad Seg status for over four more years. (Dkt. No. 200-1, ¶ 65; Dkt. No. 200-4 at 3.)

---

[4] Plaintiff disputes the accuracy and/or legitimacy of this determination. (Dkt. No. 201-1, ¶ 6.)

Throughout Plaintiff's restrictive confinement, he was issued multiple disciplinary and unusual incident reports for varying offenses. (Dkt. No. 201-1, ¶ 7; Dkt. No. 200-3.)[5]

## B.    Procedures Governing Plaintiff's Restrictive Confinement

Under DOCCS Directive 4933, an individual could only have been placed in Ad Seg if DOCCS determined that the individual's presence in general population would threaten the safety and security of the facility. (Dkt. No. 200-1, ¶ 52.) Once placed in Ad Seg, state law and DOCCS policy required that an individual's Ad Seg status be periodically reviewed to determine whether the "inmates' presence in general population would pose a threat to the safety and security of the facility." (Dkt. No. 200-1, ¶ 53 (quoting 7 N.Y.C.R.R. § 301.4(b) (version eff. Dec. 5, 2007 - Dec. 16, 2020))).

Some inmates are designated for Ad Seg in their facility only and their periodic reviews are conducted only at the facility level. (Dkt. No. 200-1, ¶ 54.) Others, including Plaintiff, were designated for Ad Seg across the agency, with their periodic reviews finalized by DOCCS central office. (*Id.*)

When an inmate was designated for Central Office review, the periodic reviews consisted of a three-step process. (Dkt. No. 200-1, ¶ 55.)  First, a three-person facility-level committee would prepare a recommendation purportedly based on the institution's record.  (*Id.*) The facility committee's recommendation and any statement by the inmate were then forwarded to DOCCS's Central Office. (*Id.*) None of the named Defendants in this action were part of the facility-level review committee.  (Dkt. No. 201-1, ¶ 36.)

---

[5] Plaintiff disputes both the accuracy of the information contained in the documents related to his disciplinary infractions as well as the legitimacy of the need to keep him in restrictive confinement even with these infractions. (Dkt. No. 201-1, ¶ 7.)

In the Central Office, a three-member committee would write their own recommendation to the Deputy Commissioner for Correctional Facilities. (Dkt. No. 200-1, ¶ 56.) In that process, the Committee would communicate with the facility and sometimes discuss the inmate with the facility's Superintendent. (*Id.*)

The Deputy Commissioner would make the final determination as to whether to retain or release the inmate from Ad Seg. (Dkt. No. 200-1, ¶ 57.) From November 2011 until his retirement in September 2017, Defendant Bellnier served as the Deputy Commissioner and was responsible for the review of Plaintiff's Ad Seg status. (Dkt. No. 201-1, ¶ 58.) From September 2017 until his retirement on December 30, 2020, Defendant O'Gorman served as the Deputy Commissioner. (Dkt. No. 201-1, ¶ 60.) Joseph Noeth is the current Deputy Commissioner of DOCCS facilities; he began in this role on March 1, 2021. (Dkt. No. 200-1, ¶ 63.)

At the beginning of Plaintiff's confinement under an Ad Seg designation, reviews of his confinement were required every 60 days. (Dkt. No. 200-1, ¶ 58.)  In July 2017, the Deputy Commissioners were required to begin conducting these reviews every 30 days. (*Id.*) DOCCS did not conduct all of the required reviews. (Dkt. No. 200-1, ¶ 59.)[6]

As of March 31, 2022, new limitations have been imposed on, among other things, the use of restrictive confinement within DOCCS correctional facilities. *See* N.Y. Correct. Law § 137(6)(i)(i).

### C.    Placement in the Step-Down Program

On January 26, 2021, the Central Office Committee issued a report stating that "in the last two years [Plaintiff] has made remarkable progress which makes him a good candidate for placement in a less restrictive setting." (Dkt. No. 200-4 at 3.) The Committee further opined that

---

[6] Plaintiff continued to receive periodic reviews while he was in the RCTP.  (Dkt. No. 200-1, ¶ 60.)

such a transition "will continue to foster [Plaintiff's] custodial behavioral adjustment with the long term goal [of] placing him in general population[,]" and therefore "recommended that [Plaintiff] . . . be transitioned into a less restrictive housing placement with the anticipation that he will continue to behave accordingly and program appropriately." (*Id*.)

On February 3, 2021, Plaintiff entered a "step-down program" at Mid-State Correctional Facility. (Dkt. No. 200-1, ¶ 4.) While in the Step-Down Program, Plaintiff lived in a repurposed SHU. (*Id*., ¶ 24.) The goal of the Step-Down Program is to safely and successfully return inmates who were in the SHU to general population upon completion of the program. (*Id*., ¶ 22.)

The physical attributes of Plaintiff's cell were the same as when he was housed in the SHU on Ad Seg status. (Dkt. No. 200-1, ¶ 25.) The Step-Down Program was comprised of three phases, which inmates progressed through based on behavior and program participation. (*Id*., ¶ 27.)

Plaintiff did not receive periodic reviews in the Step-Down Program such as those he received while in Ad Seg. (Dkt. No. 194-1, ¶ 77.) Although Plaintiff did not complete all phases of the Step-Down Program, he was returned to general population on March 2, 2022. (Dkt. No. 194-4; Dkt. No. 194-25; Dkt. No. 194-38; Dkt. No. 195-13, ¶¶ 7-8.)

## III.   THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### A.   Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for summary judgment on the following three discrete issues: (1) that Defendants Bellnier and O'Gorman, as the Deputy Commissioners who signed Plaintiff's periodic reviews, were each personally involved in the alleged violations of Plaintiff's constitutional rights; (2) that Plaintiff's thirteen-year period of restrictive confinement violates the objective prong of the Eighth Amendment, i.e., posed an unreasonable risk of serious damage to his health; and (3) that the failure by Defendants Noeth and Passage to conduct any periodic

reviews while Plaintiff was confined in the SHU in the Step-Down Program between February 2021 and March 2022 was a violation of Plaintiff's due process rights. (Dkt. No. 194-1 at 6-8.) Plaintiff argues that summary judgment is appropriate with respect to these three issues because (1) there is no dispute that Defendants Bellnier and O'Gorman made the periodic determinations that Plaintiff should remain in the SHU on Ad Seg status and other courts have found personal involvement under similar circumstances, (2) there is no dispute that Plaintiff spent approximately thirteen years confined in the SHU (or in SHU-like conditions), and Plaintiff has introduced undisputed record evidence that such a lengthy period of restrictive confinement is objectively unreasonable, and (3) there is no dispute that Defendants Noeth and Passage failed to conduct periodic reviews between February 2021 and March 2022, and they were required to do so as a matter of law.  (*Id*.)

Defendants oppose Plaintiff's motion, arguing that (1) Plaintiff is not entitled to a ruling on summary judgment on issues that are not determinative of liability, (2) questions of fact remain regarding whether or not Defendants Bellnier and O'Gorman had sufficient personal involvement to render them liable on one or more of Plaintiff's claims, (3) Plaintiff has failed to establish that he suffered a per se deprivation of any basic human need as a result of the Ad Seg conditions to which he was subjected, (4) the second amended complaint does not assert any claims arising out of Plaintiff's confinement in the SHU between February 2021 and March 2022, while Plaintiff was in the Step-Down Program, which is neither Ad Seg nor Disciplinary Segregation, (5) Plaintiff was not entitled to periodic Ad Seg reviews while he was in the Step-Down Program, which is not punitive in nature, and (6) Plaintiff has failed to offer any admissible evidence showing that either Defendant Noeth or Defendant Passage were personally

involved in any decision related to Plaintiff's participation in the Step-Down Program. (Dkt. No. 200.)

### B.       Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Plaintiff's claims and argue that they are entitled to summary judgment because (1) Plaintiff has failed to establish that any of them were personally involved in the alleged wrongdoing, (2) Plaintiff has failed to establish that he suffered a violation of his Eighth Amendment rights as a result of his restrictive confinement, (3) Plaintiff has failed to establish that he suffered a violation of his Fourteenth Amendment due process rights based on the nature and scope of his periodic Ad Seg reviews, (4) Plaintiff has failed to establish that he suffered a deprivation of a serious medical need, or that any of the Defendants were responsible for any such deprivation, (5) some of Plaintiff's claims are untimely, and (6) Defendants are entitled to qualified immunity. (Dkt. No. 195-2.) Defendants also argue that all of Plaintiff's claims against Defendant Martuscello must be dismissed because only official capacity claims remain against this Defendant, and "there is no injunctive relief left for [the Acting DOCCS Commissioner] to bring about" in light of Plaintiff's discharge from Ad Seg status. (*Id*. at 12-13.)

Plaintiff opposes Defendants' motion, arguing that (1) genuine issues of material fact preclude summary judgment on each of his claims, (2) the evidence in the record establishes that each named Defendant was personally involved in the alleged constitutional violations, (3) Plaintiff's claims are all timely, and (4) Defendants are not entitled to qualified immunity. (Dkt. No. 201.)[7]

---

[7] Plaintiff states that "[b]ased on discovery," he "agrees not to press claims against Defendant Venettozzi and thus does not dispute that the Court can enter summary judgment for him." (Dkt. No. 201 at 6 n.2.) Accordingly, the Court finds that Plaintiff has explicitly abandoned his claims against Defendant Venettozzi, *see Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant

### C.      Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

Where, as here, both parties have filed motions for summary judgment, "the court must evaluate each party's motion on its own merits." *Heublein, Inc. v. U.S.*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The moving party may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party must

---

claims or defenses that are not defended have been abandoned."), and Plaintiff's claims against this official are therefore dismissed with prejudice. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing claims that were abandoned on summary judgment); *Leavitt v. Ethicon, Inc.*, 524 F. Supp. 3d 360, 367 (D. Vt. 2021) (granting motion for summary judgment in light of the plaintiffs' "unequivocal abandonment of certain claims").

"set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### D.    Discussion

#### 1.    Official Capacity Claims

The second amended complaint includes official capacity claims against several of the named defendants, including former DOCCS Commissioner Annucci (who has been substituted for Daniel F. Martuscello). (*See generally*, Dkt. No. 180, ¶¶ 17, 19, 22, 24, 26, 27, 28, 131, 132, 138, 142, 148.) With respect to Defendant Noeth, who is a named defendant based on his role as former Superintendent of Attica Correctional Facility and current DOCCS Deputy

Commissioner, he is sued only in his official capacity for alleged wrongdoing in his role as DOCCS Deputy Commissioner. (*Id.*, ¶¶ 19, 25.)

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in Plaintiff's second amended complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the

Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for *an ongoing violation of law or the Constitution*. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

In this case, the record before the Court is clear that Plaintiff was released from the SHU and placed in general population in March 2022, i.e., more than two years ago. Moreover, recent changes to N.Y. Corr. Law § 137 limit the amount of time that an incarcerated individual may be placed in restrictive confinement to (1) no more than fifteen consecutive days and/or (2) no more than twenty total days within any sixty-day period. *See* N.Y. Corr. Law § 137(i)(i) ("No person may be placed in segregated confinement for longer than necessary and no more than fifteen consecutive days. Nor shall any person be placed in segregated confinement for more than twenty total days within any sixty day period except as otherwise provided in subparagraph (ii) of this paragraph."); N.Y. Corr. Law § 137(k)(iii) ("No person may be placed in segregated confinement or a residential rehabilitation unit based on the same act or incident that was

previously used as the basis for such placement."). In light of these facts, Plaintiff cannot establish that he is suffering (or is likely to suffer) from an ongoing violation of federal law related to the claims in this case for which prospective relief may be appropriate. *See Hendrix v. Annucci*, No. 20-CV-0743 (GTS/TWD), 2024 WL 1285394, at \*17 (N.D.N.Y. Mar. 26, 2024) (finding, in light of the plaintiff's release to the general population on July 27, 2022, and changes to N.Y. Corr. Law § 137 that went into effect on March 31, 2022, that the allegedly wrongful behavior related to the plaintiff's confinement in Ad Seg "could not reasonably be expected to recur").

Although Defendants have only moved for summary judgment with respect to Plaintiff's official capacity claims against Defendant Annucci (now Defendant Martuscello), under the Prison Litigation Reform Act, 42 U.S.C.A. § 1997e, a court may "on its own motion . . . dismiss any action brought with respect to prison conditions under section 1983 of this title . . . if the court is satisfied that the action . . . fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C.A. § 1997e(c)(1). "Section 1997e(c) is applicable throughout the life of a case and provides the District Court with the authority to sua sponte dismiss at any time during litigation if it becomes apparent that this dismissal provision has been satisfied." *Luna v. Gentry*, No. 22-CV-04098, 2023 WL 6536176, at \*5 (W.D. Ark. Apr. 27, 2023) (collecting cases), *report and recommendation adopted by* 2023 WL 6367696 (W.D. Ark. Sept. 29, 2023); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n.11 (3d Cir. 2002) (citation and internal quotation marks omitted) (explaining that "the PLRA sets up a two-step dismissal process by which dismissal can occur early for the facially inadequate complaints pursuant to [28 U.S.C. § 1915A] or can occur later" if it becomes apparent that the dismissal provision of 42 U.S.C. § 1997e(c) is

satisfied); *Beenick v. LeFebvre*, 684 Fed. App'x. 200, 204 (3d Cir. 2017) (upholding District

Court's sua sponte dismissal of a claim at the summary judgment stage pursuant to 28 U.S.C. §

1915A and 28 U.S.C. § 1997(e)); *Davis v. Gallagher*, 951 F.3d 743, 750-51 (6th Cir. 2020)

(holding that, "whatever threshold dismissal determination a district court makes under [the

initial screening required by] § 1915A, it is allowed to make subsequent dismissal determinations

in accordance with § 1997e(c)(1)").[8] Moreover, this dismissal provision applies regardless of

whether an incarcerated individual is represented by counsel. *See, e.g., Steele v. New York State

Dep't of Corr. Servs.*, No. 99-CV-6111, 2000 WL 777931, at *1 (S.D.N.Y. June 19, 2000) ("The

contention that Section 1997e (a) does not apply to plaintiff because he is represented by counsel

is without merit."); *Tarver v. Kunzweiler*, No. 20-CV-0392, 2020 WL 6050572, at *1 (N.D.

Okla. Oct. 13, 2020) ("The PLRA's screening and dismissal provisions apply even though Tarver

is represented by counsel and has paid the filing fee in full." (collecting cases)).

Because Plaintiff cannot recover monetary damages for his official capacity claims and,

at the time he filed his second amended complaint, no basis existed for awarding prospective

injunctive relief, the pleading fails to state an official capacity claim against any of the named

defendants.

Accordingly, summary judgment is appropriate with respect to Plaintiff's official

capacity claims against Acting DOCCS Commissioner Martuscello, and Defendants' motion is

granted in this regard. Moreover, in this Court's view, it is unmistakably clear that Plaintiff

cannot succeed on an official capacity claim against any other named defendant for the reasons

---

[8] "Where appropriate, a trial judge may [also] dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) [citations omitted], *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

stated above. However, in light of Second Circuit precedent, the Court will afford Plaintiff twenty-one (21) days to show cause why his remaining official capacity claims should not be dismissed pursuant to 42 U.S.C.A. § 1997e(c)(1) and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.[9]

### 2. Timeliness

In Section 1983 actions, the applicable statute of limitations is the State's "general or residual statute for personal injury actions." *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)) (alterations omitted). In New York, a three-year statute of limitations applies for personal injury actions and thus to Section 1983 actions. *Id.*; *see also* N.Y. C.P.L.R. § 214(5).

Federal law determines when a Section 1983 action accrues, which, in the context of a discrete violation, has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (citation omitted); *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (explaining that a constitutional claim premised on a discrete violation typically accrues when the "plaintiff either has knowledge of his or her claim or has enough information that a reasonable person would investigate and discover the existence of a claim"). However, the continuing violation doctrine "provides an exception to the normal

---

[9] "[A] court has the inherent power to dismiss without leave to amend or replead . . . where amendment would . . . be futile[.]" *Williams v. Mills*, No. 21-CV-4207, 2021 WL 2003193, at *4 (S.D.N.Y. May 19, 2021) (internal citations omitted). In light of the aforementioned changes to New York law and the more than two-year period that has lapsed since Plaintiff was in restrictive confinement under Ad Seg status, it would be futile to grant Plaintiff leave to amend to replead his official capacity claims.

The Second Circuit has held that "it is bad practice" to sua sponte dismiss without affording a plaintiff the opportunity to be heard in opposition." *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999) ("A court's dismissal on its own motion is sometimes described as a 'sua sponte' dismissal. . . . Perhaps because of the similarity between the words 'sua sponte' and 'spontaneous,' legal parlance sometimes confuses the court's power to act on its own motion with the power to act immediately without affording an opportunity to be heard in opposition. . . . Unless it is unmistakably clear that the court lacks jurisdiction, or that the complaint lacks merit or is otherwise defective, we believe it is bad practice for a district court to dismiss without affording a plaintiff the opportunity to be heard in opposition." (citing, *inter alia*, *Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir.1988))).

knew-or-should-have-known accrual date." *Gonzalez*, 802 F.3d at 220 (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999))(internal quotation marks omitted). The doctrine "applies to claims composed of a series of separate acts that collectively constitute one unlawful [ ] practice," and where applicable, "the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable ... claim." *Id*. (internal quotation marks and citations omitted); *Lucente v. County of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) (noting that the continuing violation doctrine applies to "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment" (citation omitted)).

The Second Circuit has applied the continuing violation doctrine to Eighth Amendment deliberate indifference claims. *See, e.g., Gonzalez*, 802 F.3d at 224 (applying the doctrine to an Eighth Amendment claim challenging his prolonged placement in restrictive confinement); *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) (holding that the doctrine can apply to an Eighth Amendment claim for deliberate indifference to serious medical needs); *see also Pearson v. Annucci*, No. 9:20-CV-1175 (TJM), 2022 WL 833332, at *1 (N.D.N.Y. Mar. 21, 2022) ("The continuing violation doctrine applies to Eighth Amendment claims premised on prolonged solitary confinement."); *Smith v. Annucci*, No. 18-CV-06261, 2019 WL 539935, at *7 (W.D.N.Y. Feb. 11, 2019) (applying continuing violation doctrine to Eighth Amendment challenge to long-term confinement in administrative segregation). In the context of conditions-of-confinement claims based on restrictive confinement, this is because "whether incarceration in the SHU violates the Eighth Amendment ... depends on the duration and conditions of confinement" and only accrues after the inmate has spent "some threshold period of time" in restrictive confinement. *Gonzalez*, 802 F.3d at 224. The accrual date for such an Eighth Amendment claim is therefore "a question of fact determinable only by a close assessment of the

conditions to which [the inmate] was subjected as a function of the length of that confinement." *Id*.

Thus, "even where a claim subject to the continuing violation doctrine accrues before the statute of limitations expires, it will still be timely 'as long as the violation of rights continued past' the expiration of the limitations period—i.e., as long as the plaintiff alleges a non-time-barred act contributing to the alleged violation." *Williams v. Annucci*, No. 20-CV-1417 (BKS/TWD), 2021 WL 4775970, at *3 (N.D.N.Y. Oct. 13, 2021) (citing *Gonzalez*, 802 F.3d at 224); *see also Lucente*, 980 F.3d at 309. However, "[t]hat the continuing violation doctrine can apply . . . does not mean it must." *Shomo*, 579 F.3d at 182. Indeed, the Second Circuit has made clear that "where a plaintiff brings a claim against multiple defendants, he must allege a non-time-barred act as to each defendant." *Williams*, 2021 WL 4775970, at *3 n.4 (citing *Shomo* and *Lucente*).

Furthermore, "the continuing violation doctrine is not applicable to claims asserting a violation of . . . procedural due process rights" based on the denial of meaningful and/or timely Ad Seg periodic reviews. *See Williams*, 2021 WL 4775970, at *4 (collecting cases).

The complaint in this case is dated May 22, 2020. (Dkt. No. 1 at 39.) Although not discussed by the parties, New York Executive Order 202.8, which was issued on March 20, 2020, tolled the time limits for filing legal actions from March 20, 2020 through November 3, 2020. *See White v. Gutwein*, No. 20-CV-04532, 2023 WL 5803708, at *3-4 (S.D.N.Y. Sept. 6, 2023) (discussing the tolling provisions of New York Executive Order 202.8). Thus, any claims that accrued prior to March 20, 2017 are time-barred, while claims accruing after March 20, 2017 are not.[10]

---

[10] Although the Second Circuit has recognized that "equitable tolling is applicable to the time period during which a prisoner-plaintiff is exhausting his administrative remedies[,]" *Gonzalez*, 651 F.3d at 323, the plaintiff bears the

Defendant Rock retired as a DOCCS employee on October 31, 2013, Defendant Prack retired as a DOCCS employee on December 31, 2014, and Defendant Artus retired as a DOCCS employee on December 27, 2016. (Dkt. No. 195-10, ¶ 5; Dkt. No. 195-11, ¶ 6; Dkt. No. 195-15, ¶ 6.) Thus, no rational factfinder could conclude that any of these three officials engaged in any wrongdoing within the limitations period. Accordingly, Plaintiff's Section 1983 claims against Defendants Rock, Prack, and Artus are untimely, and Defendants' motion for summary judgment is therefore granted with respect to each of the asserted claims against these officials.

Similarly, Plaintiff's Fourteenth Amendment due process claims challenging the nature and scope of Ad Seg reviews that occurred before March 20, 2017, are also untimely. Accordingly, Defendants' motion for summary judgment is granted with respect to these claims as well.

### 3. Fourteenth Amendment Claims Based on Plaintiff's Restrictive Confinement After His Release from Ad Seg Status

As noted, Plaintiff seeks summary judgment on his Fourteenth Amendment claims against Defendants Noeth and Passage arising out of the period that he was in the Step-Down Program because it is undisputed that he did not receive any periodic reviews during this time period, and the restrictive nature of his confinement implicated a liberty interest. (Dkt. No. 194-1 at 26-27.)[11] Defendants, however, argue that the second amended complaint only raises issues related to Plaintiff's Ad Seg and Disciplinary Segregation, and the Step-Down Program is neither Ad Seg nor Disciplinary Segregation. (Dkt. No. 200 at 15.) In other words, Defendants contend that Plaintiff's second amended complaint does not properly assert Section 1983 claims based on

---

burden of establishing equitable tolling. *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). In this case, Plaintiff has not argued exhaustion of administrative remedies warrants, or that any other basis exists for, equitable tolling.

[11] Plaintiff's Section 1983 claims based on alleged wrongdoing during this time period are asserted against Defendant Passage and Defendant Noeth in his official capacity as Deputy Commissioner. (Dkt. No. 180.)

his restrictive confinement between February 3, 2021 and March 3, 2022, i.e., the time period that Plaintiff was in the Step-Down Program, but still housed in a SHU-like setting.[12] Defendants alternatively argue that they did not have an obligation to provide periodic Ad Seg reviews once Plaintiff's Ad Seg status terminated, and have moved for summary judgment dismissing these Defendants on the ground that Plaintiff has failed to establish that either Defendant Noeth or Defendant Passage were personally involved in any decision-making related to Plaintiff's participation in the Step-Down Program, or with respect to any other claim. (Dkt. No. 200 at 15-16; Dkt. No. 195-2, at 14-17.)[13]

"A procedural due process analysis proceeds with two questions." *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) "'[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id*. (quoting *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)).

"[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions and duration 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "Confinement to segregated housing may trigger procedural due process protections, depending on the length, frequency, and conditions of the confinement." *Williams v.*

---

[12] In his Reply, Plaintiff argues that the second amended complaint raises Eighth and Fourteenth Amendment claims based on the entire time period that he was housed in restrictive confinement, which includes the time period that he was in the Step-Down Program, and alternatively seeks leave to amend in the event the Court does not read the pleading as broadly. (Dkt. No. 205 at 12-14, n.10.)

[13] Defendants have also moved for summary judgment with respect to Plaintiff's Section 1983 claims against Defendant Passage on the grounds that this official was not personally involved in any of the alleged wrongdoing. (Dkt. No. 195-2 at 13-17.)

*Annucci*, No. 20-CV-1417 (BKS/TWD), 2021 WL 4775970, at *7 (N.D.N.Y. Oct. 13, 2021) (citing, *inter alia*, *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that the "duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical")). "A sufficiently long confinement, even under normal SHU conditions, is 'a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.'" *Id*. (quoting *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (holding that procedural due process protections were required for a confinement in SHU of 305 days)). Here, it is undisputed that Plaintiff remained housed in restrictive confinement throughout the entire time that he was in the Step-Down Program, which exceeded one year.[14]

As an initial matter, it is not entirely clear to the Court that the second amended complaint properly asserts Fourteenth Amendment due process claims against either Defendant Noeth or Defendant Passage arising out of Plaintiff's time in the Step-Down Program. Indeed, the second amended complaint makes no reference to the Step-Down Program or the time period during which Plaintiff was in this program, and does not include any allegations regarding what role, if any, Defendants Noeth and Passage allegedly played in any periodic (or one-time)

---

[14] In *Proctor v. LeClaire*, 846 F.3d 597 (2d Cir. 2017), the Second Circuit expressly ruled that "the Due Process Clause requires, among other things, that prison officials periodically review whether an inmate who is confined in Ad Seg continues to pose a threat to the facility in order to ensure that Ad Seg is not used a pretext to keep the inmate in the SHU indefinitely." *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 372 (N.D.N.Y. 2020) (citing *Proctor*, 846 F.3d at 601). The Circuit explained that the purpose of periodic reviews "is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as a pretext for indefinite confinement of an inmate." *Proctor*, 846 F.3d at 609. Defendant Passage testified (and stated in his declaration) that the Step-Down program is intended to aid incarcerated individuals in their transition from segregated housing to general population, (Dkt. No. 194-10 ("Passage Dep. Tr."), pp. 32, 74-75; Dkt. No. 195-13, ¶ 7), which appears to be a fact not in dispute. Plaintiff argues that periodic reviews were required in the Step-Down Program. (Dkt. No 194-1, at 26–28). Defendants dispute that Plaintiff was entitled to the same periodic reviews in the Step-Down Program, where Program Management Teams (PMT) monitored an incarcerated individual's progress and an incarcerated individual could appeal PMT's decisions to the superintendent. (Dkt. No. 200 at 14–17). For the reasons discussed below, the Court need not (and does not) reach that issue.

review. Moreover, based on the express allegations in the second amended complaint, Plaintiff's

Fourteenth Amendment claims are targeted solely at his restrictive confinement while in Ad Seg.

(Dkt. No. 180, ¶¶ 143-148.)[15] In fact, the entire scope of the pleading could be construed to be

limited to the time period prior to Plaintiff's placement in the Step-Down Program.[16]

However, the Court need not resolve this issue because even assuming that the second

amended complaint properly noticed Fourteenth Amendment due process claims arising out of

Plaintiff's confinement in the Step-Down Program, Plaintiff is not entitled to summary judgment

for at least two reasons.

First, the second amended complaint was filed by stipulation, wherein the parties recite

the scope of the changes to the operative pleading. (Dkt. No. 174.) Those changes include the

addition of Defendant Noeth *in his official capacity* as DOCCS Deputy Commissioner for

Correctional Facilities, which is a role he assumed in March, 2021, i.e., while Plaintiff was in the

Step-Down Program. (*Id.*; *see also* Dkt. No. 174-2, ¶ 19.) The second amended complaint does

not include an individual capacity claim against Defendant Noeth based on alleged wrongdoing

---

[15] Plaintiff's final Ad Seg review occurred in January, 2021, when it was decided that he would be released from Ad Seg. (Dkt. No. 194-40 at 1-5.)

[16] The allegations in the second amended complaint related to this point are inconsistent. For example, Paragraph 2 of the second amended complaint differs from the original complaint in that it includes a change in the identified time period that Plaintiff was "subjected to long-term, cumulative, and continuous punishment" through his placement in "solitary confinement" from "over ten consecutive years[,]" as alleged in the original complaint (Dkt. No. 1, ¶ 2.), to "approximately twelve consecutive years" (Dkt. No. 174-2, ¶ 2). The parties agree that Plaintiff was placed on Ad Seg status on April 10, 2009. "[A]pproximately twelve consecutive years" later would be sometime just before April 10, 2021, which of course would include the date Plaintiff's Ad Seg status was terminated, but would not extend to March 2, 2022, when Plaintiff was released from the Step-Down Program. Footnote 2 of paragraph 2 also expressly defines the term "solitary confinement" as used by Plaintiff throughout the pleading to "refer to [Plaintiff's] confinement in the Special Housing Unit . . . under both administrative segregation . . . status and disciplinary sanctions[.]" (Dkt. No. 180, n.2.) The footnote does not define the term "solitary confinement" to include Plaintiff's confinement in the SHU following the termination of his Ad Seg status. In addition, paragraph 35 of the second amended complaint includes a change in the identified time period that Plaintiff was "continuously held in solitary confinement" from "since 2009[,]" as alleged in the original complaint (Dkt. No. 1, ¶ 35.), to "from 2009 to 2021" (Dkt. No. 174-2, ¶ 35) – not 2022. However, the second amended complaint added Defendant Passage as a party to the proceeding, and this official was the Superintendent of Mid-State Correctional Facility, where Plaintiff was housed only after he was in the Step-Down Program. (Dkt. No. 205 at 13-14; Dkt. No. 194-4.)

while he was DOCCS Deputy Commissioner for Correctional Facilities. (Dkt. Nos. 174-2, 180.)
Moreover, as noted above, there is no longer a justification for maintaining official capacity
claims in this case. Thus, there is no basis for maintaining Plaintiff's Fourteenth Amendment
claim against Defendant Noeth based on his role as Deputy Commissioner while Plaintiff was in
the Step-Down Program.

Second, as Defendants note in their opposition to Plaintiff's motion for partial summary
judgment, "[t]he Step Down Program is run by the Deputy Superintendent for Programs and co-
chaired by the Deputy Superintendent for Security[,]" and incarcerated individuals in the
program interact with Program Management Teams to discuss their progress, whether they are
meeting their goals in the program, phase progression, and ultimately program completion. (Dkt.
No. 200 at 15-16 (citing Dkt. No. 194-10 ("Passage Dep. Tr."), pp. 116-118.)[17] Incarcerated
individuals also can appeal decisions made by Program Management Team members with which
they do not agree to the Superintendent. (*Id.*)

The second amended complaint does not name any Program Management Team
members, the Deputy Superintendent for Programs at Mid-State Correctional Facility, or the
Deputy Superintendent for Security at Mid-State Correctional Facility as defendants. (Dkt. No.
180.) Furthermore, Plaintiff has not introduced any evidence showing that he ever appealed any
decisions made by Program Management Team members to Defendant Passage, or filed any
grievances related to wrongdoing that occurred while he was in the Step-Down Program. Nor has
Plaintiff introduced any evidence showing that Defendant Passage (1) took any actions to
continue (or extend) Plaintiff's participation in the Step-Down Program, (2) created the

---

[17] Although one of the deposition transcript pages cited by the Defendants is not part of the record, Plaintiff also does
not dispute these facts.

procedures governing the Step-Down Program, or (3) affirmatively limited the scope of any progress review.[18] Instead, Plaintiff simply argues that Defendant Passage violated his Fourteenth Amendment rights because this official was "the 'ultimate decider' of whether someone would remain in the SHU and/or the step-down program" and therefore could have done something to remove Plaintiff from restrictive confinement sooner, yet did not. (Dkt. No. 194-1 at 29-30.)[19]

Setting aside the oversimplification of this statement, the fact that a Superintendent of a correctional facility may hypothetically have the authority to remove an incarcerated individual from restrictive confinement is not, without more, a basis for finding personal involvement in depriving that individual of the process to which he was entitled, which is the genesis of Plaintiff's due process claim. *See, e.g.*, *Brody v. McMahon*, 684 F. Supp. 354, 356 (N.D.N.Y.) ("To sustain a 42 U.S.C. § 1983 action, there must be some showing of personal responsibility for the alleged constitutional deprivation." (citing *Duchesne v. Sugarman*, 566 F.2d 817, 830 (2d Cir. 1977))), *aff'd*, 862 F.2d 304 (2d Cir. 1988); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 317 (S.D.N.Y. 2008) ("Finkle, as Executive Director of the CCRB, did not have the authority to take action with respect to any constitutional violation plaintiffs may have suffered from their confrontation with Officers Melendez and Jaikissoon. It necessarily follows that the

---

[18] Defendant Passage became the Superintendent at Mid-State Correctional Facility in May, 2021. (*See* Passage Dep. Tr. at 18:12-14.) By this time, Plaintiff had already been in the Step-Down Program for several months. Thus, no argument can be made that Defendant Passage was responsible for Plaintiff's initial placement in the Step-Down Program without process. In addition, evidence in the record shows that Defendant Passage did not participate in Program Management Team meetings after he became Superintendent, and played no role in Plaintiff's continued placement in the Step-Down Program. (Passage Dep. Tr. at 131; Dkt. No. 195-13, ¶¶ 8-12.)

[19] Plaintiff's moving brief cites testimony from Defendant Passage, including what Plaintiff characterizes as testimony from Defendant Passage that he was the "ultimate decider" of any recommendations by the PMT, and "the sole decider" of appeals from PMT decisions. (Dkt. No. 194-1 at 29-30.) However, Defendant Passage specifically testified that he did not participate in PMT recommendations because, as Superintendent, he would review appeals made by inmates of PMT recommendations. (Passage Dep. Tr. at 130-131.) In addition, there is no evidence in the record that Plaintiff ever appealed a PMT recommendation to Defendant Passage while he was Superintendent. (*See also* Passage Dep. Tr. at 172-173, 176-181.)

allegations are insufficient to plead the personal involvement of Finkle in any alleged constitutional violation against plaintiffs."). Simply put, the mere fact that Defendant Passage was the Superintendent of the facility is not evidence from which a reasonable juror could find that he was personally responsible for the alleged due process violation associated with Plaintiff's restrictive confinement while in the Step-Down Program.

Accordingly, Plaintiff's motion for summary judgment with respect to his Fourteenth Amendment due process claims arising out of his restrictive confinement while in the Step-Down Program is denied, and Defendants' motion for summary judgment dismissing this claim against Defendant Passage is granted. As noted above, the Court will afford Plaintiff twenty-one (21) days to show cause why his official capacity claim against Defendant Noeth should not be dismissed pursuant to 42 U.S.C.A. § 1997e(c)(1) and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

### 4.   Remaining Eighth Amendment Claims Based on Plaintiff's Restrictive Confinement

Plaintiff asserts two theories regarding violations of the Eighth Amendment. First, Plaintiff claims that Defendants deprived him of "basic human needs" due to his conditions of confinement. (*See* Dkt. No. 180, ¶¶ 122-132.) Second, Plaintiff argues that the specific length of time he was subjected to restrictive confinement was unconstitutional because at some point there was no legitimate penological justification for keeping him confined in such conditions. (*See* Dkt. No. 180, ¶¶ 139-142); *see also H'Shaka*, 444 F. Supp. at 378-80 ("As to the subjective element, the Supreme Court has noted that conditions satisfying the Eighth Amendment standard include 'those that are totally without penological justification.'" (quoting *Hope v. Peltzer*, 536 U.S. 730, 737 (2002))).

Defendants argue that they are entitled to summary judgment on Plaintiff's remaining conditions-of-confinement claims because (1) Plaintiff has failed to establish that any of them were personally involved in the alleged wrongdoing, and (2) Plaintiff has failed to establish that he suffered a violation of his Eighth Amendment rights as a result of his restrictive confinement. (Dkt. No. 195-2 at 13-24.)[20] In his opposition, Plaintiff contends that the undisputed record shows that each of the remaining Defendants was personally involved in the alleged constitutional violations, and questions of fact remain with respect to these claims. (*See generally*, Dkt. No. 201.)

A plaintiff asserting an Eighth Amendment claim related to the conditions of his confinement must satisfy both objective and subjective tests: (1) to satisfy the objective test, "a plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs" such that the conditions "pose an unreasonable risk of serious damage to his health"; and (2) to satisfy the subjective test, "a plaintiff must demonstrate that the defendants imposed the conditions with deliberate indifference," meaning that the defendants knew of, and disregarded, "an excessive risk to the plaintiff's health or safety." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019) (Hurd, J.) (quoting *Walker v. Schult*, 717 F.3d 119, 125 [2d Cir. 2013]; *Jolly v. Coughlin*, 76 F.3d 468, 480 [2d Cir. 1996]).

Generally speaking, confining an inmate in the SHU, without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment. *See Bowens v. Smith*, No. 9:11-CV-0784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional

---

[20] In light of the dismissal of Plaintiff's Section 1983 claims against Defendants Venettozzi, Annucci, Rock, Prack, and Artus, and preliminary dismissal of Noeth in his capacity as DOCCS Deputy Commissioner, the Court need only analyze Plaintiff's Eighth Amendment claims against Defendants O'Gorman, Bellnier, Miller, Rich, Wolcott, Passage, and Noeth in his capacity as Attica Correctional Facility Superintendent.

restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013); *Hamilton v. Fisher*, No. 10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("'[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted)), *report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012); *Dixon v. Goord*, 224 F.Supp.2d 739, 748-49 (S.D.N.Y. 2002) (holding that "allegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement," which lasted ten months, were "not violations of the Eighth Amendment"); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *4 (S.D.N.Y. Feb. 17, 2015) (dismissing Eighth Amendment claim based on placement in SHU for six months with resulting loss of packages, commissary, and telephone privileges, noting that such deprivations "are not sufficient to give rise to an Eighth Amendment violation).

"However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement 'can and does lead to significant psychological harm.'" *Smith v. Annucci*, No. 18-CV-06261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation." *Smith*, 2019 WL 539935, at *6 (citing, inter alia, *Peoples v. Fischer*, 898 F. Supp. 2d at 621); *see also Williams v. Korines*, No. 16-CV-1157 (FJS/TWD), 2017 WL 11458011, at *5 (N.D.N.Y. Jan. 5, 2017) ("[SHU] confinement is not

'abnormal' unless it is 'totally without penological justification,' 'grossly disproportionate,' or 'involve[s] the unnecessary and wanton infliction of pain.'" (quoting *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984))); *Gonzalez*, 802 F.3d at 224 ("[W]hether incarceration in the SHU violates the Eighth Amendment . . . depends on [both] the duration and conditions of the confinement."

### a. Defendants O'Gorman and Bellnier

Plaintiff's conditions-of-confinement claims against Defendants O'Gorman and Bellnier are based on his restrictive confinement between November 2011 and December 30, 2020. (Dkt. No. 180, ¶¶ 16-18, 122-132.)

It is undisputed that Plaintiff was on Ad Seg or Disciplinary Segregation status for almost twelve consecutive years, followed by more than a year of restrictive confinement in the Step-Down Program, and Plaintiff has introduced evidence showing that he remained housed in the SHU, or under SHU-like conditions, throughout this entire time period. (Dkt. No. 194-2, ¶¶ 1-5; Dkt. No. 200-1, ¶¶ 1-5.) These conditions included restricted access to programming and interactions with other inmates, not being allowed to leave the cell for meals, and always being restrained when traveling from one location in the prison to another. (Dkt. No. 194-2, ¶¶ 18(c), (d); Dkt. No. 200-1, ¶¶ 18(c), (d); Dkt. No. 194-10 at 11.)

Plaintiff has also introduced record evidence showing that he began to suffer mental health complications associated with his restrictive confinement in 2012, which continued thereafter. (Dkt. No. 194-7; Dkt. No. 194-18; 194-21; Dkt. No. 194-27; 194-30; 194-32.) Indeed, as Plaintiff notes in his opposition to Defendants' motion, DOCCS's records show that Plaintiff's designated mental health level, used to determine treatment needs, changed significantly throughout the time that he was confined in the SHU. (Dkt. No. 194-31; *see also* Dkt. No. 194-

18 at 11.)[21] Plaintiff's disciplinary record also shows that for a five-year period between September 2011 and September 2016, he received only two misbehavior reports, and neither was for assaultive or violent conduct. (Dkt. No. 200-3 at 6-9.)[22]

In short, construing the record evidence in the light most favorable to Plaintiff, questions of fact remain regarding (1) whether or not there was a legitimate penological need to keep Plaintiff in Ad Seg for the length of time that he served, (2) whether Plaintiff was deprived of at least one basic human need as a result of the long duration of his confinement in a manner that violates the Eighth Amendment (in particular, the need for social contact or environmental/sensory stimulation through the lack of ability to access recreational, educational, and other programs to fill his spare time), and (3) whether at some point the risk of harm to Plaintiff became obvious to the officials who played a role in his continued Ad Seg designation. *See, e.g., H'Shaka*, 444 F. Supp. 3d at 377-81.

Finally, on the issue of personal involvement, the record shows that Defendant Bellnier served as the Deputy Commissioner and was responsible for the review of Plaintiff's Ad Seg status from November 2011 until his retirement in September 2017, and that Defendant O'Gorman served in this role following Defendant Bellnier's retirement until his own retirement on December 30, 2020. (Dkt. No. 201-1, ¶¶ 58, 60.) Moreover, it is undisputed that Defendants

---

[21] Certain Ad Seg documents signed by Defendants Bellnier and O'Gorman describe some of the mental health issues that Plaintiff was experiencing. (*See, e.g.*, Dkt. No. 194-21; Dkt. No. 194-32; *see also* Dkt. No. 194-34 ("O'Gorman Dep. Tr.") at 86-88 (testifying that he could "see what [an inmate's] mental health level was" and that he had "an understanding of what those different levels mean," yet he "never made a determination based on someone's mental health").) Thus, a rational factfinder could certainly conclude that these officials were aware that Plaintiff was experiencing certain mental health issues as a result of his restrictive confinement.

[22] The Court notes that Plaintiff subsequently received four misbehavior reports over the next two years for wrongdoing that included violent conduct, assault on staff, and assault on another inmate. (Dkt. No. 200-3 at 1-6.) While it appears that the assault incidents stem from Plaintiff discharging bodily fluids at another inmate and throwing feces and urine in the face of two corrections officers, (Dkt. No. 194-19 at 3), the record is not fully developed on these matters. Furthermore, there is no evidence in the record showing that Plaintiff received any misbehavior reports after he finished serving SHU-time for disciplinary reasons on May 6, 2020, (Dkt. No. 194-20, at 3), yet he remained housed in the SHU on Ad Seg status for more than eight additional months.

Bellnier and O'Gorman, as Deputy Commissioners, were the final arbiters of Plaintiff's

continued placement in Ad Seg during each review. (Dkt. No. 201-1, ¶ 62.) Courts have held that

this fact alone is enough to render these officials personally involved in alleged constitutional

violations stemming from the related restrictive confinement. *See, e.g., H'Shaka*, 444 F. Supp. 3d

at 366, 376.

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's

Eighth Amendment conditions-of-confinement claims against Defendants O'Gorman and

Bellnier is denied.[23]

### b.    Miller

Plaintiff's conditions-of-confinement claim against Defendant Miller is based on

Plaintiff's restrictive confinement during his incarceration at Great Meadow Correctional

Facility.  (Dkt. No. 180, ¶¶ 21, 22, 122-132.)

At various points between 2016 and January 17, 2020, Plaintiff was in Ad Seg at Great

Meadow Correctional Facility, during which time Defendant Miller was the Superintendent.

(Dkt. No. 195-12, ¶¶ 6, 12; Dkt. No. 194-4.) Plaintiff has also introduced evidence showing that

in April 2018, he filed a grievance while housed at Great Meadow Correctional Facility on Ad

Seg status wherein he (1) identified specific medical and mental health issues that he was

---

[23] Insofar as Plaintiff seeks summary judgment ruling that he has established the objective element of his Eighth Amendment conditions-of-confinement claims, the Second Circuit has never announced a bright line rule as to when placement in restrictive confinement becomes objectively unreasonable as a matter of law. Furthermore, whether or not restrictive confinement is appropriate may depend on matters such as an incarcerated individual's disciplinary record and/or safety risk. *See, e.g., Porter v. Clarke*, 923 F.3d 348, 362-63 (4th Cir. 2019) ("Notwithstanding the uncertain role of penological justification in conditions of confinement cases, we believe . . . that a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement . . . even though such conditions create an objective risk of serious emotional and psychological harm. Put simply, prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective."). Since questions of fact remain regarding these issues, Plaintiff has failed to establish that he is entitled to summary judgment on the objective element of his Eighth Amendment conditions-of-confinement claims.

experiencing, which he believed related to his restrictive confinement, and (2) expressed

concerns for his continued well-being. (Dkt. No. 201-6.) Defendant Miller testified that he

reviewed this grievance, and that he did not investigate any of Plaintiff's stated concerns further.

(Dkt. No. 201-12, pp. 226-228.)

According to Plaintiff, Defendant Miller's knowledge of Plaintiff's grievance (and the

concerns raised therein), coupled with his role as Superintendent, are enough for a rational

factfinder to conclude that this official was personally involved in violating his Eighth

Amendment rights.

Insofar as Plaintiff contends that Defendant Miller was personally involved in violating

Plaintiff's Eighth Amendment rights because, as Superintendent, he had the authority to remove

Plaintiff from restrictive confinement, the parties agree that the three-step process associated

with each Ad Seg review began with a three-person facility-level committee preparing a

recommendation, which was then forwarded to DOCCS's central office, where a different three-

member committee would write their own recommendation to the Deputy Commissioner for

Correctional Facilities, who would make the final determination of whether to retain or release

the inmate from Ad Seg. (Dkt. No. 200-1, ¶¶ 55-56; Dkt. No. 201-1, ¶ 36.) Superintendents were

not members of the facility-level committee or the central office committee and did not take part

in Ad Seg recommendations. (Dkt. No. 201-1, ¶¶ 23-25; *see also* Dkt. No. 195-12, ¶¶ 11, 16, 20,

23, 27.)  Thus, Plaintiff has failed to adduce sufficient evidence from which a rational factfinder

could conclude that Defendant Miller played a role in Plaintiff's restrictive confinement based on

the nature of his position.[24]

---

[24] Although Plaintiff contends, based on the deposition testimony of other officials, that all Superintendents "played a consistent role in reviewing, adding to, and discussing" Plaintiff's Ad Seg reviews, (Dkt. No. 201-1, ¶ 74), Defendant Miller's declaration states only that he reviewed Plaintiff's Ad Seg periodic reviews as part of his day-to-day duties

However, on this record the Court agrees with Plaintiff that questions of fact remain regarding whether Defendant Miller was personally involved in violating Plaintiff's Eighth Amendment rights when he admittedly disregarded the grievance that Plaintiff submitted (and Defendant Miller reviewed) in April 2018. In reaching this conclusion, the Court notes that Plaintiff's four-page grievance specifically sought intervention from Defendant Miller, and included details regarding Plaintiff's "deteriorating" physical and mental health, and concerns that his Ad Seg reviews were "boilerplate" and "a sham . . . often without legitimate, factual basis[,]" designed "to keep [him] in administrative segregation indefinitely[.]" (Dkt. No. 201-6.) The record before the Court does not indicate how this grievance was resolved.

Although Defendant Miller testified that "[t]he ad seg piece" of this grievance raised "[s]everal different issues" that could not be solved through the grievance process, he also testified that he was not concerned that Plaintiff was expressing concern over having lost 40 pounds since his placement in Ad Seg and did not take any steps to investigate the medical and mental health issues raised, and he did not deny that he could have taken steps to "help [Plaintiff] get proper medical care" when asked if that was something within the scope of his authority. (Dkt. No. 201-12, p. 226-227.)

Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Miller insofar as it is based on deliberate indifference to Plaintiff's well-being in and after April 2018.[25]

---

as superintendent. (Dkt. No. 195-12, ¶¶ 24-26.) There is no evidence in the record that Defendant Miller ever "add[ed] to" or "discuss[ed]" any of Plaintiff's Ad Seg reviews with anyone.

[25] It appears from the current record that on the date Plaintiff's grievance was stamped as received, (Dkt. No. 201-6, at 2), he was serving time in restrictive confinement pursuant to disciplinary sanctions imposed against him several months earlier. (Dkt. No. 200-3, at 2; Dkt. No. 194-20, at 3-4.) Roughly twelve days later, on April 21, 2018, Plaintiff was issued another misbehavior report for charges that included violent conduct, unhygienic act, interference, direct order, assault on inmate, and assault on staff. (Dkt. No. 194-20, at 3; 200-3, at 1.) Plaintiff was thereafter found guilty of the charges in the misbehavior report and sentenced to disciplinary sanctions that included confinement in the SHU through at least February 19, 2019. (Dkt. No. 200-3 at 1-4; Dkt. No. 194-20, at 3.) The Court does not reach the issue

c.      **Rich**

Plaintiff's conditions-of-confinement claim against Defendant Rich is based on his restrictive confinement during his incarceration at Elmira Correctional Facility. (Dkt. No. 180, ¶¶ 21, 26, 122-132.)

Plaintiff was transferred to Elmira Correctional Facility on January 17, 2020, and remained there on Ad Seg status until January 28, 2021. (Dkt. No. 194-4; Dkt. No. 195-14, ¶ 11.) Defendant Rich was the Superintendent at Elmira Correctional Facility throughout this time. (Dkt. No. 195-14, ¶ 6.)

Plaintiff has failed to introduce any evidence from which a rational factfinder could conclude that Defendant Rich was personally involved in the decision to keep Plaintiff in the SHU on Ad Seg status throughout his confinement at Elmira Correctional Facility.[26] Defendant Rich also expressly states in his declaration that he "had no involvement with [Plaintiff's] placement in, or continued placement in, Ad Seg at any time." (Dkt. No. 195-14, ¶ 15.)

Thus Plaintiff has failed to adduce a material issue of fact as to Rich's personal involvement in the alleged wrongdoing, or deliberate indifference to Plaintiff's well-being.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Rich, and this claim dismissed.

d.      **Defendant Passage**

Plaintiff's conditions-of-confinement claim against Defendant Passage is based on his restrictive confinement during his incarceration at Mid-State Correctional Facility, where

---

of how, if at all, Plaintiff's subsequent conduct charged in the misbehavior report may impact his Eighth Amendment claim against Defendant Miller.

[26] Plaintiff has also not introduced any evidence that he ever filed a grievance during his confinement at Elmira Correctional Facility complaining about his restrictive confinement.

Plaintiff was housed while he was in the Step-Down Program. (Dkt. No. 180, ¶¶ 21, 27, 122-132.)

As set forth above, Plaintiff has failed to introduce any evidence showing that Defendant Passage played any role in Plaintiff's placement or continuation in the Step-Down Program, or otherwise oversaw the program. Moreover, although Defendant Passage testified that he made weekly rounds throughout the area where inmates in the Step-Down Program were housed, and was responsible for reviewing complaints made by inmates related to their dissatisfaction with Program Management Team decisions, (Passage Dep. Tr., pp. 33, 132-33), there is no evidence in the record that Plaintiff ever complained to Defendant Passage verbally or in writing about the conditions of his confinement as a whole.[27]

Furthermore, the evidence in the record shows that Plaintiff was roughly three months into the Step-Down Program when Defendant Passage became Superintendent, and Defendant Passage testified as to his limited involvement in the program once he became Superintendent at Mid-State Correctional Facility, as well as his understanding that (1) inmates in the Step-Down Program had the opportunity to receive more privileges than inmates in the SHU, (2) the Step-Down Program is designed to help inmates transition from restrictive housing to general population, and (3) the nature of the Step-Down program is that attendees progress through phases, and are afforded additional privileges and opportunities as they ascend. (Passage Dep. Tr., pp. 43-48, 53-59, 75-77, 82-83, 94-101, 106-107.)

---

[27] Defendant Passage testified that he recalled speaking with Plaintiff "on a couple of occasions while making rounds[,]" during which time Plaintiff made some complaints about medical, some complaints about officers, and some complaints about not receiving "certain items[.]" Passage Dep. Tr., pp. 64-66. Defendant Passage further testified that with respect to Plaintiff's complaints regarding medical, he "would talk to the medical provider[.]" (*Id.*, p. 65-66.)

In light of these facts, no rational factfinder could conclude that Defendant Passage was either personally involved in Plaintiff's restrictive confinement at Mid-State Correctional Facility, or aware that Plaintiff faced an excessive risk to his health or safety as a result of his confinement in the Step-Down Program, and deliberately indifferent to that risk. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Passage, and this claim is dismissed.

### e.    Defendant Wolcott

Plaintiff's conditions-of-confinement claim against Defendant Wolcott is based on his restrictive confinement during his incarceration at Attica Correctional Facility while this official was the Superintendent. (Dkt. No. 180, ¶¶ 21, 28, 122-132.) Although the second amended complaint alleges that Defendant Wolcott was responsible, in part, for Plaintiff's "continuous solitary confinement for over ten years[,]" (Dkt. No. 180, ¶ 125), Plaintiff was not housed at Attica Correctional Facility while Defendant Wolcott was Superintendent until after he was discharged from the Step-Down Program and placed in general population. (Dkt. No. 195-16, ¶¶ 6, 12.)[28] Moreover, Defendant Wolcott states in her declaration that Plaintiff was transferred to Attica Correctional Facility on March 3, 2022, into the prison's general population, where he remained until March 7, 2022, when he was transferred to the SHU as a result of receiving "a disciplinary charge . . . for fighting with another incarcerated individual." (*Id*., ¶ 12.) Plaintiff does not dispute any of these facts. In addition, Plaintiff has failed to introduce any evidence showing that Defendant Wolcott was personally involved in bringing disciplinary charges

---

[28] Plaintiff was also housed at Attica Correctional Facility for a brief portion of the time that he was in Ad Seg. (Dkt. No. 194-4 at 5; Dkt. No. 195-8, ¶¶ 4, 10.) However, at that time, Defendant Noeth was the Superintendent. (Dkt. No. 195-8, ¶¶ 4, 10.) Defendant Wolcott did not become Superintendent at Attica Correctional Facility until March 8, 2021. (Dkt. No. 195-16, ¶¶ 6, 12.)

against Plaintiff that resulted in his return to the SHU, or the disciplinary hearing that apparently resulted in his continued confinement in the SHU until he was transferred to Five Points Correctional Facility on April 14, 2022.

In short, it is entirely unclear why Plaintiff has named Defendant Wolcott as a party to this action. In any event, Plaintiff's confinement in the SHU for approximately forty-five (45) days for disciplinary reasons does not, without more, present an objectively serious condition. *See Jackson*, 15 F. Supp. 2d at 363; *Dixon*, 224 F. Supp. 2d at 748-49; *Marino*, 2015 WL 5603454, at *3; *Abdur-Raheem*, 2015 WL 667528, at *4. Furthermore, there is no evidence in the record from which a rational factfinder could conclude that (1) Defendant Wolcott was personally involved the decision to house Plaintiff in the SHU for disciplinary reasons, or (2) the decision to house Plaintiff in the SHU for disciplinary reasons was made out of deliberate indifference to his well-being.

For all of these reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Wolcott, and this claim is dismissed.

### f.    Defendant Noeth

Plaintiff's remaining conditions-of-confinement claim against Defendant Noeth is based on his restrictive confinement during his incarceration at Attica Correctional Facility while Noeth was Superintendent. (Dkt. No. 180, ¶¶ 16, 19, 21, 25, 122-132.)

Insofar as Plaintiff asserts an Eighth Amendment claim against Defendant Noeth based on his role as Superintendent at Attica Correctional Facility, as noted in Defendant Noeth's declaration, Plaintiff arrived at Attica Correctional Facility on January 19, 2021, and was

transferred out on February 3, 2021. (Dkt No. 195-8, ¶ 10; *see also* Dkt. No. 194-4.)[29] The evidence in the record also shows that Plaintiff was approved for a transfer out of this facility on January 21, 2021, received a review of his Ad Seg status by the facility three-member committee on January 22, 2021, and was approved for release from Ad Seg on January 28, 2021. (Dkt. No. 194-40.) In other words, the only periodic review that Plaintiff received while he was incarcerated at a facility in which Defendant Noeth was the Superintendent resulted in his release from Ad Seg.

In addition, there is no evidence in the record that Defendant Noeth was involved in any aspect of Plaintiff's review, or the recommendation to place him in the Step-Down Program. Simply put, Plaintiff has failed to adduce sufficient evidence from which a rational factfinder could conclude that Defendant Noeth was (1) personally involved in any aspect of Plaintiff's Ad Seg designation, or (2) aware, in his capacity as Superintendent of Attica Correctional Facility, that Plaintiff faced an excessive risk to his health or safety as a result of his transition from Ad Seg to the Step-Down Program, and acted with deliberate indifference to that risk by allowing him to enter that program.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Noeth in his individual capacity, and this claim is dismissed.

### 5.    Remaining Eighth Amendment Medical Indifference Claims

Defendants argue that they are entitled to summary judgment dismissing Plaintiff's medical indifference claims because he has failed to "identify a specific serious medical need"

---

[29] Plaintiff was officially placed in the Step-Down Program on February 3, 2021, which is the date he arrived at Mid-State Correctional Facility. (Dkt. No. 194-4; 195-13, ¶¶ 7, 10.)

that was not properly treated or addressed during his restrictive confinement, and there is no evidence in the record that any Defendant acted with deliberate indifference to any serious medical need.  (Dkt. No. 195-2 at 28-30.)

In response, Plaintiff cites to record evidence showing a decline in his mental and physical health over the course of his restrictive confinement and argues that each of the named Defendants specifically knew that restrictive confinement was seriously harming Plaintiff, yet disregarded his serious medical needs by continuously maintaining his placement there. (Dkt. No. 201, at 23-25 (citing record evidence).)

As an initial matter, Plaintiff has failed to introduce admissible evidence from which a reasonable factfinder could conclude that any of the remaining Defendants were involved in the alleged denial of medical care to him and/or acted with deliberate indifference to his serious medical needs. Indeed, the second amended complaint does not identify any specific medical need of Plaintiff that was not treated.

Insofar as the second amended complaint alleges that Plaintiff suffered "psychological or physical injury" from his prolonged restrictive confinement, which the Defendants disregarded, (*see* Dkt. No. 180, ¶¶ 133-138), the evidence in the record shows that incarcerated individuals in Ad Seg had regular access to a medical nurse, an OMH nurse, and an OMH counselor, each of whom performed daily rounds in the SHU. (Dkt. No. 195-5, ¶ 35; Dkt. No. 201-1, ¶ 14.) There is also evidence in the record that Plaintiff was transferred to the Central New York Psychiatric Center ("CNYPC") at various times while he was in Ad Seg for mental health evaluation and/or treatment. (Dkt. No. 194-23, 194-24, 194-30, 194-31.) In other words, while Plaintiff may dispute the adequacy of the medical and mental health treatment that he received throughout his period of restrictive confinement, there is no dispute that he was provided with medical and

mental health care (and had regular access to it) throughout the period of his restrictive confinement.

Furthermore, insofar as Plaintiff contends that the treatment he received (and was able to access) was inadequate because his mental health condition continued to deteriorate, this argument fails to explain (let alone create an issue of fact regarding) how any of the named Defendants were personally involved in decisions related to the level of mental health care that Plaintiff received while in Ad Seg. *See, e.g.*, *H'Shaka*, 444 F. Supp. 3d at 376-77 (dismissing medical indifference claims against Deputy Commissioners who served as final arbiters of the Plaintiff's Ad Seg reviews based on lack of personal involvement, noting that "[a]ny argument that [the Plaintiff's] placement and retention in Ad Seg was, by itself, in effect an inherent denial of adequate medical care as a general matter is not persuasive because . . . Plaintiff was provided relevant medical care while in Ad Seg"). Stated differently, while questions of fact remain regarding whether or not Defendants Bellnier and O'Gorman subjected Plaintiff to constitutionally inadequate confinement conditions, and evidence that Plaintiff's mental health deteriorated during his time in restrictive confinement is perhaps relevant to the issue of their potential deliberate indifference,[30] such evidence is not a basis for subjecting these officials to liability for alleged wrongdoing by medical professionals. *See Animashaun v. Fischer*, No. 19-CV-0820 (LEK/DJS), 2020 WL 374578, at *15 n.26 (N.D.N.Y. Jan. 23, 2020) (noting that the special housing unit case management committee's deference to "a determination by one or more OMH professionals that [the plaintiff] was not suffering from a condition that . . . placed his mental health 'at issue' during any of his disciplinary hearings, or . . . warranted placement on

---

[30] It is well-settled that "deliberate indifference can also sometimes be inferred 'from the fact that the risk of harm is obvious.'" *H'Shaka*, 444 F. Supp. 3d at 380 (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

the OMH mental health caseload . . . does not give rise to a cognizable Eighth Amendment claim" against the non-medical professional); *Gonzales v. Wright*, No. 06-CV-1424, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 23, 2010) ("The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate." (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 111(2d Cir. 2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."))); *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so.").[31]

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Eighth Amendment medical indifference claims, and these claims are dismissed.

### 6.      Remaining Fourteenth Amendment Due Process Claims

As noted above, Plaintiff's Fourteenth Amendment due process claims challenging the nature and scope of Ad Seg reviews that occurred before March 20, 2017, are untimely. Thus,

---

[31] Because the evidence in this case shows that Plaintiff was evaluated several times by officials from CNYPC, including during incidents in which he expressed thoughts of self-harm, no reasonable factfinder could conclude that Plaintiff was completely denied treatment for his mental health concerns while he was in Ad Seg. The appropriate analysis for Plaintiff's underlying medical indifference claim "is therefore whether any inadequacy of treatment was sufficiently serious, not whether his mental health conditions themselves were sufficiently serious." *H'Shaka*, 444 F. Supp. 3d at 387. Although Plaintiff points to his deteriorating condition throughout his period of restrictive confinement as evidence of inadequate treatment, he has not adduced evidence showing that at any point during his restrictive confinement, he was suffering from a medical or mental health condition that was not treated by one or more medical professionals. Thus, even assuming Plaintiff experienced some degree of mental symptoms at certain times while he was in Ad Seg, no reasonable fact finder could find that the care provided was inadequate to the point of establishing a constitutional violation. For this alternative reason, summary judgment is warranted dismissing Plaintiff's medical indifference claims.

the Court need only consider the merits of Plaintiff's due process claims that challenge the nature and scope of the Ad Seg reviews that occurred on and after March 20, 2017.

Defendants argue that they are entitled to summary judgment with respect to these claims because (1) Plaintiff has failed to establish that any of them were personally involved in the alleged wrongdoing, and (2) Plaintiff has failed to establish that he suffered a violation of his Fourteenth Amendment rights in connection with his Ad Seg reviews. (Dkt. No. 195-2 at 13-18, 24-28.) Plaintiff contends that the undisputed record shows that each of the remaining Defendants was personally involved in the alleged constitutional violations, and questions of fact remain with respect to these claims. (Dkt. No. 201 at 9-17, 26-29.)

"The Due Process Clause requires, among other things, that prison officials periodically review whether an inmate who is confined in Ad Seg continues to pose a threat to the facility in order to ensure that Ad Seg is not used a pretext to keep the inmate in the SHU indefinitely." *H'Shaka*, 444 F. Supp. 3d at 372 (citing *Proctor*, 846 F.3d at 601). The purpose of periodic reviews "is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as a pretext for indefinite confinement of an inmate." *Proctor*, 846 F.3d at 609 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476-477 n.9 [1983]). Prison officials have "'wide latitude in the procedures they employ' when Ad Seg is used to 'incapacitate an inmate who represents a security threat' and who remains a security risk throughout his confinement in Ad Seg." *Id.* (quoting *Proctor*, 846 F.3d at 609).

"The Second Circuit has identified three criteria that meaningful periodic reviews of continued Ad Seg confinement must satisfy: (1) the officials must actually evaluate whether the continued confinement is justified rather than simply go through the procedural motions guided

by a preordained outcome (i.e., regardless of what the evidence shows); (2) the officials must

evaluate whether the justification exists at the time of review or will exist in the future,

considering new evidence related to changes in prison conditions and inmate behavior, although

the officials are not barred from according significant weight to past events; and (3) the officials'

purpose in continuing Ad Seg must be maintaining institutional safety and security or another

valid reason rather than the desire to impose punishment on the inmate." *H'Shaka*, 444 F. Supp.

3d at 372 (citing *Proctor*, 846 F.3d at 610-11).

Insofar as Plaintiff raises due process claims based on the failure to timely conduct

certain reviews, with adequate notice for him to submit objections to the reviews (as required by

DOCCS policy), "such failures to adhere strictly to state or institutional policy are not sufficient

to establish a constitutional violation." *H'Shaka*, 444 F. Supp. 3d at 372 (collecting cases).

Moreover, the record establishes that the facility-level committee reviews were completed

approximately every two months throughout the initial seven years that Plaintiff was in Ad Seg

(and not on disciplinary confinement). (Dkt. No. 195-4.) Beginning in August 2017, facility-

level committee reviews were completed every thirty (30) days, except for a three-month period

between March and May 2018.  (Dkt. No. 195-4 at 88-189.) Thus, the Court finds that there is no

issue of fact that these reviews were conducted at least periodically, and satisfy the constitutional

requirement in that respect.

With respect to the reviews themselves, the Court finds, for the same reasons set forth in

Section III.D.4 above, that Plaintiff has failed to adduce admissible evidence from which a

reasonable factfinder could conclude that any of the Superintendents at the facilities where

Plaintiff was housed after March 20, 2017, were personally involved in the alleged procedural

deficiencies associated with Plaintiff's Ad Seg reviews. *See also Hendrix*, 2024 WL 1285394, at

*17 (granting motion for summary judgment and dismissing due process claims against Superintendents employed at facilities where the plaintiff was housed in Ad Seg based on a "lack of admissible record evidence establishing these four superintendent Defendants' personal involvement in this alleged constitutional violation"). For the reasons set forth in Section III.D.1 above, the Court also finds that Plaintiff's official capacity claims against Defendant Noeth warrant dismissal.

However, after having thoroughly considering all of the review documents from April 10, 2009 (when Plaintiff was placed in Ad Seg) to January 28, 2021 (when both the facility-level committee and the central office review committee recommended Plaintiff be released from Ad Seg), and the totality of the other evidence in the record, the Court finds that there is a genuine dispute of material fact as to whether the reviews in which Defendants Bellnier and O'Gorman were involved were sufficient to afford Plaintiff the due process to which he was entitled.[32]

Most troubling to the Court is the first *Proctor* factor (i.e., whether the committee members and Deputy Commissioner merely went through the procedural motions guided by a preordained outcome). Based on the current record, a reasonable fact finder could conclude that Plaintiff's violent conduct prior to being placed in Ad Seg (and his sporadic and seemingly non-violent incidents while in Ad Seg leading up to September 28, 2016) were used as a pretext to keep him in Ad Seg in order to punish him for past conduct.[33] For example, during the seven

---

[32] Because Defendant Bellnier retired in September, 2017 and Defendant O'Gorman retired on December 30, 2020, no defendant remains in this case with respect to any potential procedural due process violations that occurred thereafter.

[33] It appears from the record that the first time Plaintiff was charged with assaultive and violent conduct during his period of Ad Seg confinement was September 28, 2016. (Dkt. No. 200-3.) Furthermore, the admissible evidence in the record is largely undeveloped with respect to the incidents that formed the basis of Plaintiff's disciplinary history. For example, Plaintiff was charged with drug possession on August 4, 2010 and July 14, 2011. (Dkt. No. 200-3 at 10-11.) However, it is entirely unclear what drug(s) Plaintiff was charged with possessing, how the contraband was discovered, or what defense, if any, was offered by Plaintiff to these charges. In addition, there is no evidence in the

reviews that took place between May 19, 2015 and July 5, 2016, the Central Office Review

Committee recited Plaintiff's criminal history, disciplinary history during previous

incarcerations, gang affiliation, and receipt of misbehavior reports during his current

incarceration as the reasons for continuing to keep Plaintiff in Ad Seg. (Dkt. No. 195-4, Pl. Ad.

Seg. Rev., p. 00057, 00060, 00063, 00066, 00069, 00072, 00079.) Although the only two

misbehavior reports Plaintiff received during this one-year period appear to have been for

relatively minor incidents, there is no explanation in any of these reports regarding whether or

not these two infractions independently justified Plaintiff's continued Ad Seg status, or, if not,

what Plaintiff needed to do to be discharged from Ad Seg status. (*Id*. [indicating that Plaintiff

received a misbehavior report on September 22, 2015 for "unauthorized exchange" and received

a misbehavior report on February 21, 2016 for "harassment".)[34]  Moreover, the record is

undeveloped regarding incidents that resulted in the misbehavior reports Plaintiff received

between September and November 2016, and Plaintiff's subsequent Ad Seg reviews simply cite

the charges in those misbehavior reports.  (Dkt. No. 195-4 at 81-90.)  The Court is therefore

unable to properly evaluate whether more than one year of additional SHU confinement based on

the disciplinary sanctions was warranted, or instead whether a juror might find that it was part of

an ongoing pretext to keep him in Ad Seg in order to punish him for past conduct.

Furthermore, as noted, there is no evidence in the record that Plaintiff received any

disciplinary charges after April 21, 2018, and the Central Office Review Committee expressly

stated in its final review recommending release from Ad Seg status that Plaintiff made

---

record that Plaintiff received any disciplinary charges after April 21, 2018, and the information in the record related
to the disciplinary charges on this date is limited to the charges themselves. (Dkt. No. 200-3 at 1.)

[34] It appears from the Central Office Committee review notes from November 18, 2015, that Plaintiff remained in the
Pilot Incentive Program after the incident that resulted in his receipt of a misbehavior report in September, 2015 (Dkt.
No. 195-4, Pl. Ad. Seg. Rev., p. 00063, 00066), which is at least some evidence that the incident did not independently
justify Plaintiff's continued Ad Seg status.

"remarkable progress" over a *two-year period* leading up to January 26, 2021, yet none of the reviews during this time provided any clear explanation regarding what Plaintiff needed to do to be discharged from Ad Seg status. (Dkt. No. 194-40; Dkt. No. 195-4.) In addition, although Plaintiff received a misbehavior report on January 26, 2020, charging him with assault on staff and creating a disturbance, he was found not guilty of all charges at a subsequent hearing. (*See* Dkt. No. 195-4 at 164.) Nonetheless, on October 6, 2020, the Central Office Review Committee cited the incident that formed the basis of the dismissed disciplinary charges as a reason for continuing Plaintiff's Ad Seg status. (Dkt. No. 195-4 at 174.)

As was the case in *H'Shaka*, this Court is similarly "troubled by the complete absence of any meaningful indication by DOCCS of when and under what circumstances Plaintiff might be released from Ad Seg[,]" *H'Shaka*, 444 F. Supp. 3d at 374, particularly for the period of time between the middle of 2019 and late 2020. Furthermore, Defendant Bellnier acknowledged during his deposition that reviews came to him with the "reasoning" section already completed, and that he signed what was presented to him. (Dkt. No. 194-5 ["Bellnier Dep. Tr."] p. 132:9-18; Dkt. No. 201-7 ["Bellnier Dep. Tr."] pp. 204:15-205:12, 345:21-346:4.) When considered together, these facts, as well as others identified in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, are enough to create a genuine issue of material fact regarding whether Defendants Bellnier and O'Gorman engaged in a meaningful review of Plaintiff's continued Ad Seg status.

In light of the foregoing, the Court denies Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment due process claims against Defendants Bellnier and O'Gorman.

### 7. Qualified Immunity

Defendants argue that they are also entitled to qualified immunity with respect to each of Plaintiff's Section 1983 claims. (Dkt. No. 195-2, at 30-31.) Plaintiff argues that Defendants are not entitled to qualified immunity because the alleged constitutional violations were clearly established at the time of the alleged wrongdoing. (Dkt. No. 201 at 34.)

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). On a motion for summary judgment, the court evaluates claims of qualified immunity using a two-part inquiry: (1) "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right,'" and (2) "whether the right in question was 'clearly established' at the time of the violation," *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (alterations in original) (first quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and then quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Courts have discretion to decide the order in which to engage these two prongs." *Id.* at 656 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted).

Here, as previously discussed, material factual disputes remain as to the reasonableness of Plaintiff's continued Ad Seg designation during at least some portions of his yearslong period of restrictive confinement. Because these material factual disputes remain, the Court concludes that deciding the issue of qualified immunity at this stage is inappropriate. *See Smith*, 435 F. Supp. 3d at 442; *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman*

*v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004))); *Hemphill v. Schott*, 141 F.3d 412, 417-18 (2d

Cir. 1998) (reversing the district court's finding of qualified immunity where there were factual

disputes as to movements made by the plaintiff prior to the use of force and explaining that

"summary judgment based either on the merits or on qualified immunity requires that no dispute

about material factual issues remain"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 505

(N.D.N.Y. 2010) ("[I]t is impossible to 'determine whether [the defendant] reasonably believed

that . . . force was not excessive when several material facts [are] still in dispute, [and therefore,]

summary judgment on the basis of qualified immunity [is] precluded.'" (first, fourth, fifth, and

sixth alterations in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999))).

Accordingly, Defendants' motion for summary judgment on the basis of qualified immunity is

denied.

**8.    Plaintiff's Motion for Summary Judgment on the Issue of Personal Involvement**

Plaintiff argues that he is entitled to a summary judgment ruling that Defendants Bellnier

and O'Gorman were personally involved in the alleged violations of his constitutional rights.

(Dkt. No. 194-1 at 18-20.) Specifically, Plaintiff argues that there is no dispute that these

officials were "each the final arbiters" of Plaintiff's restrictive confinement from November 2011

"until their respective retirements" and thus, "through [their] own actions" violated Plaintiff's

constitutional rights. (*Id*.)

Defendants argue that this is not an appropriate issue for summary judgment, and, in any

event, questions of fact remain regarding the personal involvement of these officials in the

alleged wrongdoing. (Dkt. No. 200 at 7-10.)

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary

judgment on "part of" a claim or defense. Nonetheless, some courts have dismissed motions for

summary judgment that "seek[ ] adjudication of only a single element of a claim," finding that "[t]he use of Rule 56 to resolve an element of a claim is wasteful of judicial resources in situations, such as this one, where there is a dispute on the remaining issues which will necessarily be resolved at trial." *Member Services, Inc. v. Sec. Mut. Life Ins. Co. of New York*, No. 06-CV-1164 (TJM/DEP), 2010 WL 3907489, *16 (N.D.N.Y. 2010); *Melini v. 71st Lexington Corp.*, No. 07-CV-0701, 2009 WL 413608, at *3 (S.D.N.Y. Feb.13, 2009).

In general, this Court tends to agree that motions for summary judgment seeking the adjudication of only certain elements of a claim are a waste of judicial resources. Furthermore, in this case Plaintiff is not even seeking a ruling that Defendants Bellnier and O'Gorman acted with subjective deliberate indifference in signing off on recommendations by the Central Office Review Committee to keep Plaintiff in the SHU on Ad Seg status. Rather, Plaintiff is seeking an affirmative ruling that the act of adopting those recommendations is enough to render these officials personally involved in the alleged constitutional violations.

While this may be true, the fact that Defendants Bellnier and O'Gorman adopted recommendations to keep Plaintiff in the SHU on Ad Seg status can only give rise to liability on Plaintiff's conditions-of-confinement claims if these officials acted out of deliberate indifference to Plaintiff's well-being in doing so, and can only give rise to liability on Plaintiff's due process claims if the reviews by these officials failed to afford Plaintiff the process to which he was entitled. In other words, a ruling on the issue of personal involvement is not dispositive of any element of any of Plaintiff's surviving claims. Furthermore, a ruling in Plaintiff's favor on the issue of personal involvement will almost certainly serve to confuse the jury at trial.

48

Accordingly, Plaintiff's motion for summary judgment on the issue of personal involvement is denied.[35]

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Clerk substitute Daniel F. Martuscello as a defendant in place of Anthony J. Annucci; and it is further

**ORDERED** that Plaintiff's motion for partial summary judgment, (Dkt. No. 194), is **DENIED in its entirety**; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 195), is **GRANTED in part** and **DENIED in part** as set forth above; and it is further

**ORDERED** that Plaintiff shall have twenty-one (21) days to show cause as to why all of his official capacity claims should not be dismissed pursuant to 42 U.S.C.A. § 1997e(c)(1) and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. Defendants have fourteen days from the date of any submission by Plaintiff to respond. In the event Plaintiff does not file anything further, the Clerk shall dismiss these claims in accordance with this Decision and Order; and it is further

**ORDERED** that the following claims are **DISMISSED with prejudice**: (1) Plaintiff's official capacity claim against Defendant Martuscello; (2) Plaintiff's Eighth Amendment conditions-of-confinement claims against Defendants Martuscello, Noeth (in his capacity as

---

[35] The Court recognizes that the Honorable Glenn T. Suddaby ruled in *H'Shaka* that by conducting the final review of a facility-level review committee's recommendations to keep an incarcerated individual in Ad Seg, Defendants Bellnier and O'Gorman were personally involved in the alleged Eighth Amendment violation related to that individual's conditions of confinement. *H'Shaka*, 444 F. Supp. 3d at 376. Judge Suddaby, however, reached that conclusion in the context of evaluating *the defendants' motion* for summary judgment on that claim. *Id*. Furthermore, Judge Suddaby also found that conducting the final review of a facility-level review committee's recommendation was not enough to establish personal involvement with respect to the medical indifference claim raised by that plaintiff. *Id*.

Superintendent of Attica Correctional Facility), Rock, Artus, Rich, Passage, Wolcott, Venettozzi, and Prack; (3) Plaintiff's Eighth Amendment medical indifference claims against all of the Defendants; and (4) Plaintiff's Fourteenth Amendment procedural due process claims against Defendants Martuscello, Noeth (in his capacity as Superintendent of Attica Correctional Facility), Miller, Rock, Artus, Rich, Passage, Wolcott, Venettozzi, and Prack; and it is further

**ORDERED** that Defendants' motion for summary judgment is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>July 29, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge